# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE DIVISION

| | |
|---|---|
| THEODORE BROOMFIELD, *et al.*, | Case No. 5:17-cv-01027-BLF |
| Plaintiffs, | |
| v. | |
| CRAFT BREW ALLIANCE, INC., *et al.*, | |
| , | |
| Defendants. | |

# REBUTTAL DECLARATION OF STEFAN BOEDEKER
# IN SUPPORT OF PLAINTIFFS' MOTION FOR CLASS CERTIFICATION

**Table of Contents**

1    Introduction ................................................................................................................... 1

2    Rebuttal of Dr. Lemon's Flawed Opinions ........................................................... 1

   2.1    Dr. Lemon Misrepresents the Economic Loss Model in the Boedeker Report............... 2

   2.2    Dr. Lemon Incorrectly Claims that My Conjoint Survey is Invalidated by Missing
        Attributes .......................................................................................................... 5

   2.3    Dr. Lemon Incorrectly Claims that Reversal of Preferences on the Individual Level
        Invalidate the Results from the CBC in the Boedeker Report ........................................ 8

      2.3.1    Fallacy of Reviewing Part-Worths for Individual Respondents .............................. 8

      2.3.2    Dr. Lemon's Fallacy of Interpreting Allegedly "Illogical" Individual Choices ....... 8

      2.3.3    Dr. Lemon Misrepresents the Use of Valid Econometric Modeling Techniques
      Like the Use of a Monotonicity Constraint ........................................................ 9

      2.3.4    Dr. Lemon Incorrectly Uses the CBC Results to Conclude that Class-Wide
      Damages Do Not Exist .................................................................................... 11

   2.4    Dr. Lemon Incorrectly Claims that Hypothetical Scenarios Invalidate the Survey
        Results.............................................................................................................. 13

   2.5    Dr. Lemon Incorrectly Claims that the Dynamic Nature of the Craft Beer Market
        Invalidates the Survey Results ............................................................................ 16

   2.6    Dr. Lemon's Mischaracterization of Which Segment of the Beer Market the Participants
        in the Boedeker Study Represent Leads Him to Erroneous Conclusions..................... 18

   2.7    Dr. Lemon's Fundamental Misunderstanding of Choice Based Conjoint Methodology
        Leads to Flawed and Incorrect Conclusions About the Boedeker Study ..................... 20

   2.8    Dr. Lemon Incorrectly Argues that Individual Class Members' Facts and Circumstances
        Are Proof that Class-wide Damages Do Not Exist...................................................... 22

3    Summary and Conclusion................................................................................................. 23

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

# 1   Introduction

1. Previously, I was retained by counsel for Plaintiffs to develop an economic loss model to quantify economic damages (if any) suffered by the class due to having purchased Kona Beer brewed by Craft Brew Alliance, Inc. ("Defendant") that was not brewed in Hawaii as purchasers had been made believe by alleged false or deceptive representations.

2. In order to measure class-wide damages resulting from the alleged false or deceptive representations, I utilized choice based conjoint ("CBC") analysis and the well-established econometric and statistical approaches of Mixed Logit Modeling and Hierarchical Bayesian Estimation to derive a quantification of the economic loss per purchaser for a number of scenarios, which are described in the Boedeker Report.

3. In general, the results of the empirical study in the Boedeker Report showed that class members in the aggregate would have paid more for Kona Beer based on the fact that it was brewed in Hawaii, leading to class-wide damages. The results of my conjoint analysis demonstrated an average economic loss of 12.7% to the consumer (i.e., price premium) as a result of the alleged misrepresentation.

4. I presented my findings in an Expert Report ("Boedeker Report") that was submitted to Defendant on March 29, 2018.

5. I have now been asked by counsel for Plaintiffs to respond to the opinions expressed in the report by Defendant's expert, Dr. Andrew Lemon, which was submitted to Plaintiffs on May 4, 2018.

# 2   Rebuttal of Dr. Lemon's Flawed Opinions

6. In the following, I review in detail the arguments made by Dr. Lemon in response to the Boedeker Report, which leads me to the conclusion that none of his arguments have an impact on my analysis, and therefore, my opinions and conclusions offered in the Boedeker Report have not changed.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

**2.1 Dr. Lemon Misrepresents the Economic Loss Model in the Boedeker Report**

7. As explained in more detail in paragraphs 75-82 of the Boedeker Report, CBC is a scientifically accepted method that enables us to determine the difference in value (both measured in dollar or as a percentage of purchase price in the actual world) that customers place on products based on certain attributes – in this case, the value of a Kona Beer brewed in Hawaii versus a Kona Beer brewed in the continental United States.[1]

8. Dr. Lemon fundamentally misunderstands the methodology of choice based conjoint ("CBC") when he claims that

> *"it is inappropriate for a researcher to assume that the Defendant's alleged misconduct induced all, or almost all, members of the proposed class to purchase Kona beer. In other words, a researcher cannot assume that all, or almost all, members of the proposed class satisfy the second criterion for economic injury under Plaintiff's theory of harm, i.e., that a purchaser values the challenged products more when they are brewed in Hawaii rather than in the continental United States."[2]*

9. In this regard, Dr. Lemon fundamentally misunderstands CBC and the methodology that I employed. The Boedeker Report utilizes CBC methodology, without assumption, to assess empirically if misleading consumers to believe that Kona Beer is brewed in Hawaii has changed aggregated consumer demand for the beer, such that the price for the beer would have gone down if all consumers had known the beer is not brewed in Hawaii at the time of purchase.

10. The following example demonstrates how Dr. Lemon's rebuttal of the Boedeker Report is based on a fundamental misunderstanding and misrepresentation of the methodology of CBC. Let's assume a produce store sells apples for $1 each, and at that price the store sells 100 apples per day. Unbeknownst to the consumer but known to the store-owner, the apples contain worms, a fact that the seller did not disclose to the consumers at the point of purchase. The question that the methodology presented in the Boedeker Report addresses is the determination of the price that the 100 consumers who bought the worm-infested apples would have paid if they had known about the worms at the point of

---

[1] Boedeker Report, Paragraph 74.
[2] Lemon Report, Paragraph 118.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

purchase. In other words, how much more has the seller been able to charge for the 100 apples sold as a result of not disclosing the worm problem?

11. The Boedeker Report utilizes CBC to answer this question empirically. In general, a change in an attribute of a product can either shift aggregate demand for the product up if the change in the attribute is viewed favorably by consumers, it can leave the demand unchanged if the consumers are indifferent to the changes attribute, or it can shift the demand curve downward if the change in the attribute makes the product less desirable to the consumers. In economic terms, it has to be determined if the disclosure that the apples are worm-infested would shift aggregated consumer demand downward.

12. The starting point for economic loss calculations for the 100 original purchasers is the price that these purchasers actually paid when they did not know about the worms ($1 in the example). The supply in this economic loss model is defined by the 100 apples that were sold when the fact that they have worms was concealed at the point of purchase. The comparison price for economic loss calculations is the price that the 100 original purchasers would pay for the apples if they had known about the worms at the point of purchase. In other words, the economic loss to the buyer is the difference of $1 paid in the actual world (where the fact that the apples have worms is concealed from the buyer) and the price of the apples the buyers would pay in the but-for-world (where the buyer knows about the worms at the point of purchase).

13. Importantly, if aggregate demand shifts downward, the economic loss is the same for each buyer regardless of their individual preferences. Dr. Lemon either ignores or misunderstands this fundamental principle.

14. The argument that different consumers may have very different preferences for (or aversions to) consuming apples with worms resulting in different individual willingness-to-pay ("WTP") across consumers does not disprove the methodology nor the results of the Boedeker Report. Rather, Dr. Lemon's argument is based on the flawed assumption that the economic loss in the Boedeker Report is derived from the difference in the individual WTP.

15. The continuation of the example with the worm-infested apples clearly demonstrates Dr. Lemon's flawed criticism in this regard. Every consumer has suffered an economic loss if the price of the apples with the worms disclosed at the point of purchase drops below $1 – even those consumers who love apples so much that their individual willingness to pay is more than $1 after the disclosure of the worms.

16. Let's assume the market price would have been $0.50 if worms had been disclosed in the first place. For apple lovers with only a slight distaste for worms, the individual WTP for a worm-free apple may have not changed or changed only slightly, but it is not this slight change in WTP that measures the consumer's economic loss because the consumer actually paid $1 for the apple with the undisclosed worms, but would have paid $0.50 if the worms had been disclosed.

17. This consumer, just as all other consumers who paid $1 for the apple on that day, has suffered an economic loss of $0.50. Similarly, for worm haters whose individual WTP drops to zero after disclosure of the worms, their economic loss is not the full $1 price paid actually paid, but the difference in the price actually paid for a $1 worm-free apple and the price of $0.50 that they would have paid if the worms had been disclosed.

18. The economic loss model presented in the Boedeker Report takes into account how *all* participants' preferences impact *aggregate* demand. The application of the CBC technique offers a method of modeling the hypothetical change in price for the same set of consumers because it uses a single set of respondents to estimate how much *the market as a whole* values a product with and without a false or misleading statement (or apples with disclosed and undisclosed worms in my example).

19. Applying the foregoing analogy to the work I performed in this case, the failure to disclose the worms in the apples is akin to the misleading representation Kona Beer is brewed in Hawaii. The Boedeker Report used CBC to utilized CBC to empirically determine the demand in the but-for-world.

20. To be clear, the Boedeker Report did not simply assume that aggregate consumer demand shifts downward – as erroneously proffered by Dr. Lemon – but rather it estimated

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

aggregate demand curves based on the results from the CBC study and then determined the degree of the shift based on the new information (i.e., that Kona Beer is not brewed in Hawaii).[3]

## 2.2 Dr. Lemon Incorrectly Claims that My Conjoint Survey is Invalidated by Missing Attributes

21. Dr. Lemon speculatively posits that the omission of several attributes in my conjoint survey could have invalidated the results.[4] His opinions on this point are unfounded for several reasons.

22. First, Dr. Lemon fails to mention that any omitted attributes would have to vary between the product choices presented in the CBC in order to have any effect. However, he provides no valid empirical support for the assertion that attributes such as freshness or eco-friendliness vary between the product choices.

23. For example, Dr. Lemon stresses the importance of freshness in beer and argues that this attribute should have been included in the conjoint survey.[5] The marketing material produced by Kona in this litigation includes only *one* document that mentions the keyword "Freshness":

> *Aloha XXX,*
>
> *Thanks for reaching out. That code on there is the production date, not the expiration date. We typically say that with proper storage (not in direct light or heat) the beer will retain freshness for at least 6 months. It's still safe to drink after that, but might not taste good. Where did you purchase it? I'd like to send a note to our sales guy to make sure we have old beer taken off the shelf.*
>
> *Mahalo![6]*

24. The document appears to provide templates for responses to consumer requests. The statement that "the beer will retain freshness for at least 6 months"[7] does not paint Kona Beer as a

---

[3]    See 6.3 of the Boedeker Report.
[4]    Lemon Report, Paragraph 197.
[5]    Lemon Report, Paragraph 170.
[6]    CBAKONA00004319.
[7]    It is highly unlikely that the shipping time from Hawaii to the continental United States would take six months or more, and thus have a negative impact on the freshness of the beer.

perishable product. Put simply, freshness would apply to all beer brands, and unless there is a difference between beer brands, this attribute can be omitted without any impact on the validity of the study. Indeed, as explained below, such extraneous attributes should be omitted from conjoint studies.

25. Dr. Lemon also asserts that eco-friendliness or "carbon footprint" should have been an attribute included in the conjoint survey because it is important to purchasers of Kona Beer.[8] In contrast to Dr. Lemon's suggestion, I am not aware that Defendant advertises its carbon footprint and highlights that Kona Beers are brewed close to their purchasers.

26. As a general matter, there are numerous products that consumers pay top dollar for that are clearly not "eco-friendly." Take for example, Fiji Water that is shipped from Fiji. That water is expensive, and is surely not "eco-friendly," but purchasers of Fiji Water buy it despite its obvious negative carbon footprint. This can also be seen in the beer market. Imported beers are an important sub-category of the US beer market.[9] Many of these beers are sold in the United States and come from as far away, if not farther, than beer brewed in Hawaii. Again, because imported beers are generally sold at a premium relative to domestic beers, there is nothing to suggest that beer consumers generally, or Kona Beer purchasers more specifically, place a demonstrable value on eco-friendliness relative to other attributes.

27. Moreover, as with the freshness attribute, Dr. Lemon also provides no compelling evidence for his claim that eco-friendliness is important to Kona customers. I am neither aware of any marketing materials to consumers produced by Kona in this litigation that describe eco-friendliness as a key attribute that distinguishes Kona from other beer brands nor does anything on the labeling and packaging materials suggest eco-friendliness.[10] To the contrary, I am aware of documents where Defendant believes that Kona Beer plays "a long way from home like an import."[11]

---

[8]   Lemon Report, Paragraph 26.
[9]   CBAKONA00011910_CONFIDENTIAL, for example, lists Craft and Import as two sub-categories of the beer market.
[10]   I searched unsuccessfully the material produced by Kona for the following keywords: "ecological", "friendliness".
[11]   See, e.g., CBAKONA00001176-1223 - Super Brands presentation.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

28. In his report, Dr. Lemon cites a paucity of evidence in support of this opinion, relying on one apparently self-serving document:

> *"These consumer preferences are reflected in how the Defendant describes its Kona brand: "[Kona] is Hawaii's first and largest craft brewery and is best known for flagship beers Longboard Island Lager and Big Wave Golden Ale. The Hawaii born and Hawaii-based craft brewery prides itself on brewing the freshest beer of exceptional quality, closest to market. This helps to minimize its carbon footprint by reducing shipping of raw materials, finished beer and wasteful packaging materials."*[12]

29. This statement was issued by Defendant in an April 26, 2018 press release, well after this litigation commenced, and just over one week before the date Dr. Lemon signed his declaration. In addition, the information on carbon footprint in this statement is obscured by the strong language promoting the idea that Kona Beers are from Hawaii, which opens with: "[Kona] is ***Hawaii's first and largest craft brewery*** and is best known for flagship beers Longboard Island Lager and Big Wave Golden Ale. The ***Hawaii born and Hawaii-based craft brewery***…"

30. In summary, Dr. Lemon's argument pertaining to the omission of certain attributes from the CBC in the Boedeker Report would invalidate the results of the CBC study is unsupported by evidence and is thus speculation. Dr. Lemon's conclusion lacks any empirical foundation because Dr. Lemon did not conduct a CBC study of his own. In addition, the literature about conjoint design states that the inclusion of too many attributes in the conjoint study makes results less reliable because the choice menus get too complex and lead to respondent fatigue.[13]

31. Finally, conjoint is flexible and the survey could easily be re-fielded to in accordance with the critiques raised by Dr. Lemon, if necessary. It is my opinion, based on having conducted dozens of conjoint surveys over the past 20 years, that making these minor changes (i.e., including these two attributes) would not have a significant impact on the results, but I note here that it could be done.

---

[12] Lemon Report, Paragraph 71.
[13] Rao, Vithala, Applied Conjoint Analysis, Springer Verlag, 2014, Page 88, discusses the effects of respondent's fatigue on survey reliability.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

## 2.3 Dr. Lemon Incorrectly Claims that Reversal of Preferences on the Individual Level Invalidate the Results from the CBC in the Boedeker Report

### 2.3.1 Fallacy of Reviewing Part-Worths for Individual Respondents

32. Based on review of Dr. Lemon's report, his CV, and his publications, it does not appear that Dr. Lemon has ever designed or conducted a CBC study or econometrically/statistically analyzed the results from one.

33. This lack of experience might explain why Dr. Lemon falls into the fallacy of analyzing part-worths for individual respondents without taking into account the confidence interval around any individual prediction, which were provided to him in the covariance analysis of the CBC study from the Boedeker Report.

34. The covariance analysis shows the standard errors of the individual part-worths, which indicate that small numerical differences incorrectly identified by Dr. Lemon as "illogical responses" are nothing more than statistically insignificant variations in the data. Dr. Lemon's interpretation fails to understand that the study in the Boedeker Report is a sample-based survey, and as such, the statistical estimates of the responses have a sampling based variation.

35. Dr. Lemon also fails to recognize that the part-worths results from CBC studies must be analyzed at the aggregate level to assess aggregate consumer demand.[14] Focusing an analysis solely on individual part-worths is like the erroneous approach of drawing conclusions on a sample of size one.

### 2.3.2 Dr. Lemon's Fallacy of Interpreting Allegedly "Illogical" Individual Choices

36. In Paragraphs 185 through 189 of his report, Dr. Lemon discusses a series of survey results that he considers illogical. First, Dr. Lemon does not provide any empirical or theoretical evidence for why he considers certain responses illogical. Second, in analyzing individual part-worths, Dr. Lemon fails to take into account the confidence intervals around each point estimate, which leads him to the false conclusion that point estimates are different not in a statistically significant way. Third, it is recognized that essentially all conjoint surveys,

---

[14] Allenby and Rossi, Hierarchical Bayes Models, Handbook of Marketing, 2006.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

including the example provided above, have respondents that make choices that were not expected. This phenomenon is widely discussed in the survey research literature.[15]

37. Seemingly illogical responses can be due to preferences of survey respondents that differ from the expected preferences. For example, some individuals are extremely price insensitive which makes estimating a price coefficient difficult. Seemingly illogical responses can also be due to errors made by respondents in the survey. However, these errors reflect errors consumers also make in everyday purchasing decisions. Thus, seemingly illogical responses reflect real market behavior and should not be outright dismissed and neither would they invalidate a conjoint survey.

38. The survey panel was to estimate overall how consumers of Kona Beers (and craft beers in general) valued their expectation that Kona Beers were brewed in Hawaii versus the mainland. The results of the survey strongly indicate that overall, consumers, who purchased Kona Beers in the past 12 months, placed a higher value on Kona Beers produced in Hawaii relative to the same Kona Beers brewed in Tennessee.

### 2.3.3 Dr. Lemon Misrepresents the Use of Valid Econometric Modeling Techniques Like the Use of a Monotonicity Constraint

39. In Paragraph 190 of his report, Dr. Lemon criticizes the use of monotonicity constraints despite this technique being a common and acceptable approach in econometrics when dealing with random noise in survey data. [16]

*Another problem arises when price coefficients are positive rather than negative as expected. This may happen for some respondents due to random noise in the data or respondents who are price insensitive. Such reversals would suggest willingness to pay more for less desirable features. One way to work around this is to compute dollar values of levels using average (across respondents) utilities, which rarely display reversals. Another approach to the problem is to ignore it, assuming that the reversals are just due to random noise. A more proactive way to avoid reversals is to use an estimation method that enforces utility constraints, though there are potential drawbacks to this approach.*

---

[15]   See for example Allenby and Rossi, Hierarchical Bayes Models, Handbook of Marketing, 2006.; Orme, Getting Started with Conjoint, 3rd Edition, 2014.

[16]   Orme, Bryan A., Getting Started with Conjoint, 3rd Edition, 2014. Page 90.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

40. Despite criticizing the use of the well-accepted, commonly used, econometric technique of monotonicity constraints, Dr. Lemon fails to offer an opinion of how their inclusion affects the estimated economic loss calculations. Instead, he relies on speculation when asserting that the use of such constraints may be an indication that there is some deeper issue with the analysis. Even though Dr. Lemon was provided with all the data to test different estimation approaches with and without monotonicity constraints, he did not use such data to prove that the inclusion of the price constraints was "driving" the economic loss estimates in the Boedeker Report. Instead of developing a "better" model that would not include them, Dr. Lemon found it sufficient to offer mere speculation.

41. Dr. Lemon either did not do the analysis, rendering his criticism irrelevant, or he did the analysis and did not report the results because the inclusion of the monotonicity constraint does not affect the economic loss calculations in the Boedeker Report. I conducted the analysis with and without the monotonicity constraint and the results speak for themselves: As can be seen in Table 1 below, the model specification using the monotonicity constraint as presented in the Boedeker Report yields an average economic loss estimate of 12.67% of the purchase price while the specification without imposing the monotonicity constraint yields an average economic loss estimate of 12.88% (Table 1).

**Table 1: Economic Loss Calculations with and Without Price Monotonicity Constraints**

| Price Monotonicity Constraint | Average Economic Loss (in % of Purchase Price) |
|---|---|
| With | 12.67 |
| Without | 12.88 |

42. Dr. Lemon's failure to perform proper statistical analysis resulted in erroneous conclusions in two different aspects: First, with 0.21 percentage points, the economic loss estimate without using the monotonicity constraint is slightly larger than the one presented in the Boedeker Report. Second, in the case of a price of $16 for a 12-pack of Kona Beer, the difference amounts to approximately 3.4 cents.[17]

---

[17]  Rounded to pennies, 12.67% of $16 equals $2.03 and 12.88% of $16 equals $2.06.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

43. In summary, the difference between the results with and without price monotonicity constraints is statistically insignificant. Dr. Lemon could have conducted this analysis rather than speculating about the significance of the price monotonicity constraint.

### 2.3.4   Dr. Lemon Incorrectly Uses the CBC Results to Conclude that Class-Wide Damages Do Not Exist

44. In Paragraphs 203 to 210 of his report, Dr. Lemon conducts an inappropriate analysis of individual-level data.  In a series of charts, he claims to show that there is variation in the estimated loss if calculated for each individual respondent and concludes that

> *"If Plaintiffs or Plaintiffs' experts contend that this calculation envisioned by Mr. Boedeker is a reliable measure of damages to the proposed class as a whole (which it is not), it does not logically follow that all, or almost all, proposed class members suffered harm."[18]*

45. The first fundamental flaw in Dr. Lemon's argument is that varying estimates for the economic loss for different consumers are not proof that class-wide economic losses do not exist. In fact, even though the amounts vary, Dr. Lemon's own illustrative calculations show that the class as a whole has suffered an economic loss.

46. Dr. Lemon's approach of comparing individual willingness-to-pay ("WTP") to compute economic losses is incorrect and based on a lack of understanding of what individual WTP measures and a misrepresentation of the Boedeker Report by alleging that the economic loss calculations are individual WTP based calculations.

47. To explain the concept of individual WTP, let's assume that it is known how much benefit or utility each consumer in a given market derives from a product or service and that a method has been established to express the utility in monetary terms. Individual WTP is the highest price a customer is willing to pay for the product. Individual WTP is based on the consumer's perceived utility derived from the product and her budget. The consumer will purchase the product if the market price of the product is lower than or equal to his willingness-to-pay, but she will not purchase the product if the price is higher than the

---

[18]   Lemon Report, Paragraph 203.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

willingness-to-pay. Conversely, if a consumer's individual willingness-to-pay is below the market price of the product then that consumer will not buy the product.

48. The following simple example from the Boedeker Report[19] explains the difference between the individual willingness-to-pay and the market price: In an eBay auction, I may have found an item I want to bid on. I put my upper limit at $200. This upper limit signals my willingness-to-pay. Given that my willingness-to-pay for that particular item is $200, I would buy the product if I saw the same item with a "Buy it now" price tag of $100, but I would not buy it if the bids went above $200.

49. What does the choice of taking the offer of "Buy it now" for $100 mean in economic terms? Did my utility from purchasing the item suddenly change? Did my willingness-to-pay change? The answer is that neither one changed. However, what has changed is that the projected amount that I would pay going through the bidding process is different than the price I will pay when the competing offer is presented to me. In other words, the willingness-to-pay does not necessarily reflect the *actual price* that a consumer ends up paying for a product. Rather, my willingness-to-pay is the threshold that turns me into a buyer of the product when the market price is at or below my willingness-to-pay or precludes me from buying when the market price is above my willingness-to-pay.

50. The individual willingness-to-pay across consumers who are in the market for a product differentiates the buyer from the non-buyer. There is no other correlation between the individual willingness-to-pay of different consumers and the market price. If an individual consumer has a WTP of $20 for a 12-pack of Kona Longboard Island Lager and sees that 12-pack offered at $15.99 then that consumer will buy at $15.99 and not at $20. A consumer with an individual WTP of $10 who sees the same offer will not buy.

51. In this sense, individual preferences are irrelevant to calculating aggregate damages. *All* purchasers of Kona Beers have been financially harmed by an increase in price based on the misrepresentation, regardless of particular, individualized consumer preferences (e.g.,

---

[19]   Boedeker Report, Paragraph. 38.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

the few consumers who prefer a Kona Beer brewed in Tennessee over a Kona Beer brewed in Hawaii).

## 2.4 Dr. Lemon Incorrectly Claims that Hypothetical Scenarios Invalidate the Survey Results

52. Dr. Lemon incorrectly criticizes the Boedeker Report for using hypothetical scenarios, when hypothetical scenarios are the explicit advantage of conjoint analyses. For example, in Paragraph 50 of his report, Dr. Lemon criticizes the scenario created for the hypothetical beer purchases:

*The results of any conjoint analysis are only as reliable as its underlying consumer survey's ability to mimic the purchase choices that consumers actually face in the real paragraph world through its questions regarding hypothetical product profiles. For a conjoint analysis to be reliable, these questions regarding hypothetical product profiles must elicit simulated purchasing behavior that approximates what consumers would actually do in the real world. Mr. Boedeker's conjoint analysis and underlying consumer survey fail to mimic the purchase choices that consumers actually face in the marketplace for beer and generate results that are inconsistent with basic economics.*

53. In Paragraph 52, Dr. Lemon gives specific attention to the fact that I displayed a picture of a bottle of each beer in a scenario,[20] showing its label and the beer poured into a clear glass to display its color, rather than a 12-pack of beer:

*In fact, because of the difficulties with using hypothetical product profiles in survey questions to mimic the choices consumers face in the real world, a textbook relied upon by Mr. Boedeker (written by the president of the company that offers the Sawtooth software Mr. Boedeker uses to perform his conjoint analysis) recommends the following approach: 'For packaged goods [e.g., canned and bottled beer sold individually or in six and twelve-packs] research involving brand, package, and price, CBC with realistic store shelf displays (often displaying dozens of product alternatives) is a robust approach.' This is not the approach that Mr. Boedeker has taken.*

54. Dr. Lemon mischaracterizes the above quote by taking it out of context. The discussion surrounding the statement has nothing to do with the difficulties of using hypothetical product profiles, but is part of an introductory section explaining how to pick a "conjoint

---

[20] See Boedeker Report, Figures 12 and 13.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

method" and with the passage targeted towards marketing professionals, where conjoint studies can be focused on packaging and design. Here is the quote in context:

*In some areas of the world, survey populations do not have access to personal computers, and it may be too expensive to provide them. If your study must be administered by paper-and-pencil, this eliminates ACA or ACBC from consideration.*

*If you are dealing with small sample sizes (especially n < 100), you should be cautious about using CBC or MBC unless your attribute list is relatively concise and respondents are able to answer more than the usual number of choice questions. ACBC, ACA and traditional full-profile conjoint will stabilize estimates using smaller samples faster than CBC or MBC. See chapter 7 for a more complete discussion of sample size considerations.*

*For packaged goods research involving brand, package, and price, CBC with realistic store-shelf displays (often displaying dozens of product alternatives) is a robust approach. Increasingly, it is becoming hard to find reasons to prefer traditional ratings-based conjoint (CVA) or the ratings-based, partial-profile ACA method for general marketing research applications. CBC, as well as methods that leverage adaptive questioning and choice (such as ACBC), will dominate the conjoint landscape over the next decade.*

*If people buy the product or service by proactively configuring the product, then a menu-based conjoint approach like MBC is better suited for studying their preferences. MBC can study issues involving price sensitivity of items and bundling discounts. It can help firms create appropriate bundles of options that appeal to buyers. But MBC requires relatively large sample sizes—typically greater than 200 respondents, and often 600 or more.[21]*

55. It is clear from the full quote that it is a general statement about things to consider when setting up a conjoint study, which also include "having access to personal computers". Displaying the beer bottles and the actual beverage in a clear glass is the more appropriate image to display given that the focus of this study is not which packaging might sell more beer, but rather to measure how different attributes of craft beers impact the price that consumers would pay. Specifically, in my study I was trying to measure the impact on the price for Kona Beers based on the mistaken belief the beer is brewed in Hawaii.

56. Dr. Lemon also suggests that there are other issues caused by using the hypothetical beer profiles since they do not "mimic" the purchase choices that consumers actually face in the

---

[21]     Orme, Getting Started With Conjoint Analysis, 3rd Edition, 2014, Pages 51-52.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

real world through its questions regarding hypothetical product profiles.[22] As will be discussed below, none of these criticisms have merit.

57. Despite Dr. Lemon's analysis of supermarket data, all beers included in the Boedeker Study are widely available.[23] Furthermore, as Dr. Lemon points out in his report, in my conjoint survey I asked the respondents to assume that each of the five choices was available when making the choice. This is a common assumption used by corporate marketing professionals in thousands of conjoint studies conducted every year. Dr. Lemon does not provide any evidence that the respondents in my conjoint study (1) had issues understanding what they were supposed to do, or (2) how the alleged misunderstanding might have impacted the results. As such, this conclusion is unreliable.

58. Dr. Lemon also asserts without empirical evidence that all, multiple brewing locations of the competitor beers should have been included in my conjoint survey. However, the literature agrees with my approach that conjoint studies do not need to include all the product attributes and all the levels of each attribute.

*"Present just the right amount of information, neither too little nor too much. Some respondents have a difficult time dealing with more than about six to eight attributes in full-profile conjoint methods like CBC."[24]*

59. To reiterate, it is well-established in the conjoint literature that respondents "hold constant" product features that are not included in the survey, which allows the researcher to make appropriate causal inferences.[25] Consumers hold attributes constant that are not presented for evaluation in the survey, which mimics how consumers make choices in the real marketplace.

60. Moreover, it is simply incorrect that a reliable conjoint must include every competing product or feature. To the contrary, a conjoint should not include every potential competing

---

[22] Lemon Report, Paragraph 51-52.
[23] See Lemon Report, Paragraph 177-178 for Dr. Lemon's discussion on this topic.
[24] Bryan K. Orme, Getting Started with Conjoint, Strategies for Product Design and Pricing Research, 3rd Edition, 2014, Page 53.
[25] See Bryan K. Orme, Getting Started with Conjoint, Strategies for Product Design and Pricing Research, 3rd Edition, 2014, Page 49.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

product or features. The literature recommends including a few major competitors and product features.[26] In the publication cited in Footnote 27, the authors discuss their study of handheld cameras, where they chose to include only four major brands: Canon, Sony, Nikon, and Panasonic. The study also included only a short list of camera attributes, while omitting other important digital camera attributes, such as power source, SLR, interchangeability of lenses, speed of data transfer, and light performance. Nonetheless, the authors deem the partial list of attributes acceptable for determining the value of those attributes using conjoint.[27] Similarly, the Boedeker Study included beer brands that compete with Kona Beers and share important attributes.

61. Therefore, it was appropriate in this case to focus on the main brewery location for the competitor beers. Furthermore, Dr. Lemon does not explain how including all the locations where the competing beers included in the study are brewed would affect the study results. Again, Dr. Lemon makes no effort to conduct any empirical research to support his opinions, such as designing or conducting his own conjoint survey, and as such, Dr. Lemon's opinion on this point is not reliable.

## 2.5 Dr. Lemon Incorrectly Claims that the Dynamic Nature of the Craft Beer Market Invalidates the Survey Results

62. Dr. Lemon claims that "the marketplace for beer is not static" and that beer sellers frequently use "price discounts of various magnitudes and duration". In his report, Dr. Lemon attempts to demonstrate variation in the retail prices of various Kona brands in Figures 4A-4F, 5A-5F, 6A-6F, and Figure 7A-7C, and uses these figures to reach his conclusion regarding the dynamics in the beer industry.

63. Whether the craft beer market is dynamic and whether there might be changes in the strength of competition has no bearing on my model of demand for Kona Beer and my estimate of consumer harm. In the context of this litigation, the craft beer market is no different than other markets where conjoint studies are routinely utilized to measure class-wide economic injury.

---

[26] Allenby 2013. Using conjoint analysis to determine the market value of Product Features.
[27] Allenby 2013, Page 352.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

64. Dr. Lemon's assertion of a dynamic craft beer market does not invalidate the Boedeker Study; to the contrary, it gives strong evidence that it is the nature of the dynamic competition that provides the incentive for Defendant and its distribution partner, Anheuser-Busch, to expand production beyond the production capabilities of a craft brewery and to mislead the consumers regarding the brewing location of the beer.[28]

65. For example, in another class action, Becks was found to have misled customers by providing insufficient notification that the beer was brewed in the United States while also making ambiguous references misleading consumers to potentially believe the beer to be German.[29] This example simply illustrates that the competitive nature of the craft beer market makes it necessary that beer companies differentiate their products in order to be successful in the market.

66. Differentiated products do not require that all consumers treat the attributes of a product equally, because different attributes may appeal to different consumers. However, if a firm is able to charge more as a result of the inclusion of a particular attribute then, all else equal, product differentiation allows the firm to raise its prices. This principle is part of the very heart of this case: did Defendant's differentiation of Kona Beers allow for and result in the increase of price? My conjoint analysis was designed to answer this question. The result shows average economic losses to consumers of 12.7% of the purchase price.

67. Dr. Lemon's focus on the price premium of the "marginal consumer" in the face of changing retail prices, shows that he does not understand how the demand model in the Boedeker Report works:

*As explained above, under Plaintiffs' theory of harm, the price premium that any member of the proposed class putatively paid is the difference between the price he or she paid and the value he or she received. Given the variety of retail prices that purchasers of Kona Beer paid (see, again, Figures 4A-4F, 5A-5F, and 6A-6F), the price that Mr. Boedeker's*

---

[28] Bolado, Carolina "Anheuser-Busch Settles Claims It Hid Kirin Beer's US Origin," Law 360, January 5, 2015, available at https://www.law360.com/articles/608354/anheuser-busch-settles-claims-it-hid-kirin-beer-s-us-origin.

[29] Foote, Christian P., "Lessons in Puffery: Recent Consumer Class Action Lawsuits Against Beer Marketers," Carr McClellan, September 14, 2017, available at http://www.carr-mcclellan.com/lessons-puffery-recent-consumer-class-action-lawsuits-beer-marketers/.

*hypothetical "marginal consumer" putatively pays is not the same as the prices all, or almost all, members of the proposed class actually paid. Similarly, the value that Mr. Boedeker's hypothetical "marginal consumer" received from the Kona Beers it purchased does not represent the values that all, or almost all, members of the proposed These figures demonstrate that there is no single market price for a given beer.* [30]

68. As noted by Dr. Lemon, consumers will substitute across brands when the beers are sold at a discount, but the pattern sales of each observed price point indicate that consumers are moving along their demand curves and increase purchases as prices decrease, or conversely, decrease purchases as prices increase. These movements up and down a demand curve are consistent with the model I estimated and that is depicted in Figure 7 of the Boedeker Report.[31]

69. In addition, Dr. Lemon ignores the fact that the prices included in the Boedeker Study, which were based on real-world sales data, allow the modeling of changes in market prices along the entire demand curve, including each price point between $10.99 and $16.99. By using the average economic loss across the market simulations, the Boedeker Study takes into account how price variation impacts consumers' preferences and choices.

## 2.6 Dr. Lemon's Mischaracterization of Which Segment of the Beer Market the Participants in the Boedeker Study Represent Leads Him to Erroneous Conclusions

70. The Boedeker Report defines the target population as consumers of Kona Beer and other craft beers and the economic loss estimates are provided only for survey participants who had purchased Kona Beers in the previous 12 months.[32] Therefore, Dr. Lemon's attempt to estimate relative market shares for the overall beer market fails and his results are irrelevant to evaluate the results presented in the Boedeker Report.

71. Dr. Lemon shows his lack of understanding of the beer market in general and how CBC studies work in particular when he criticizes that the market simulations in the Boedeker Report yield different "market shares" than the ones he calculates based on Nielsen data.

---

[30]    Lemon Report, Paragraph 153.
[31]    Boedeker Report Page 18.
[32]    Boedeker Report, Paragraph. 104.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

He reports these comparisons in Figures 15A-15E in his report and then concludes that the failure to predict the relative market shares of the beers included in the Boedeker Study invalidates its results.

72. Dr. Lemon frequently cites the book "Getting Started with Conjoint" by Brian Orme which explicitly states that the results of conjoint market simulators should not be interpreted as "market shares" in actual product markets. [33]

*Under very controlled conditions (such as markets with equal information and distribution), market simulators often report results that closely match long-range equilibrium market shares. But conjoint utilities cannot account for many real world factors that shape market shares, such as length of time on the market, distribution, out-of-stock conditions, advertising, effectiveness of sales force, and awareness. Conjoint analysis predictions also assume that all relevant attributes that influence share have been measured. Therefore, the share of preference predictions usually should not be interpreted as market shares, but as relative indications of preference.*

*Divorcing oneself from the idea that conjoint simulations predict market shares is one of the most important steps to getting value from a conjoint analysis study and the resulting simulator. While external-effect factors can be built into the simulation model to tune conjoint shares of preference to match market shares, we suggest avoiding this temptation if at all possible.*

73. The CBC Study in the Boedeker Report was designed to focus on consumers of craft beers, who represent a different group with different tastes compared to beer drinkers in general. Specifically, the Boedeker Study included 12 craft beers that were chosen from a list of craft beers which had been previously recognized by the survey participants. In contrast to that, Dr. Lemon focuses parts of his analysis on the overall beer market. For example, Corona Extra – not a craft beer - accounted for almost 60% of the sales in the Nielsen market data used by Dr. Lemon. Based on this gross misrepresentation of the Boedeker Study, Dr. Lemon's analysis is irrelevant.

74. Even though CBC studies can be designed and are frequently used to predict market shares in many corporate applications, this is not the only use of CBC studies. The book by Rao cited in the Boedeker Report discusses a broad range of applications of CBC studies,

---

[33] Orme, Getting Started with Conjoint, 3rd Edition, 2014, Page 108.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

including the one applied in the Boedeker Report where CBC is used to quantify how changes in product attributes impact consumer demand and market prices. Therefore, Dr. Lemon's criticism that the Boedeker Study does not predict market shares in the overall beer market is completely irrelevant.

75. Therefore, the comparison of actual and estimated market shares in the Lemon Report is meaningless to the design of the Boedeker Study and its results.

**2.7 Dr. Lemon's Fundamental Misunderstanding of Choice Based Conjoint Methodology Leads to Flawed and Incorrect Conclusions About the Boedeker Study**

76. Dr. Lemon opines that I leave unspecified what exactly the marginal consumer in my study relied on, stating:

*Mr. Boedeker's damages model does not investigate whether his hypothetical "marginal consumer" has been misled to believe that Kona Beers are brewed in Hawaii by the packaging of the challenged products. Instead, his model assumes that his hypothetical "marginal consumer" and all other purchasers have been misled by Defendants' alleged misconduct, but leaves unspecified what exactly (if anything) his hypothetical "marginal consumer" and other purchasers relied upon when putatively purchasing Kona Beers.*[34]

77. Dr. Lemon's assertion is wrong for several reasons. First, he either misunderstands or purposefully misrepresents what the concept of the marginal consumer means. By using the nomenclature of calling the common economic concept of the marginal consumer "his hypothetical "marginal consumer"", Dr. Lemon seems to suggest that I somehow invented the concept of the marginal consumer. However, in economics the marginal consumer is simply the consumer whose willingness to pay equals the market price.

78. Second, based on a fundamental misunderstanding of how CBC studies work, and what they can do, Dr. Lemon is incorrect in stating that the model in the Boedeker Study makes assumptions about the value survey respondents place on the different brewing locations. Instead, the results from the conjoint study allows me to compute the demand curve for a specific beer and to determine the difference between the demand for the beer brewed in Hawaii and the same beer brewed in Memphis, Tennessee. In fact, the analysis in the

---

[34] Lemon Report, Paragraph 149.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

Boedeker Report does not make any assumptions about the value that study participants place on any attribute, but rather estimates the value based on the survey results.

79. Third, Dr. Lemon is mistaken in his assertion that the Boedeker Study assumes that the purchasers of Kona Beers have been misled by the Defendant. This assertion is incorrect in several respects.

80. As a theoretical matter, Dr. Lemon is incorrect that a conjoint survey must first establish common impact. Rather, it is common practice that the first step in any economic damages analysis is to assume that liability has been established. Indeed, "[d]amages quantification operates on the premise that the defendant is liable for the defendant's harmful act."[35]

81. As a factual matter, although I was not involved in the survey itself, I was aware at the time I conducted my conjoint survey that Plaintiffs' counsel retained another expert, Dr. Michael Dennis, who conducted a survey that found that approximately 7 in 10 craft beer consumers believe Kona Beers are from Hawaii based on the product packaging, and also that roughly 70 percent of craft beer consumers prefer a Kona Beer brewed in Hawaii over one brewed in the continental United States. There is also substantial evidence in the form of Defendant's own internal marketing materials that demonstrate that Defendant considers Hawaii to be a material attribute of Kona Beers:

*"Today, as this brand expands across the mainland US and select international markets, it brings a bit of paradise to far off places, vicariously transporting beer drinkers to a special place and creating that feeling of 'Always Aloha' that is central to the brand." [36]*

*"Island Chain Map Graphics. Sense of place is a big part of the KBC brand, so graphics featuring the Island Chain of Hawaii are key assets…and always featuring diamond call-outs showing the location of the Kona pubs. It is important that these graphics are used any time the Hawaiian Islands are featured, as the Islands on their own are very generic and could belong to any island-based brand."[37]*

---

[35] Reference Guide on Estimation of Economic Damages, Reference Manual on Scientific Evidence (3rd Ed.), at 429.
[36] See, e.g., CBAKONA00003615 – Brand Guidelines.
[37] CBAKONA00003636 – Brand Guidelines.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

*"And Kona has the ability to play a long way from home like an import. [...] It is both a metaphor and a real place with real people, a real culture and a real spirt essence. [...] Kona is the imported craft beer from Hawaii."[38]*

82. Finally, in tandem with Defendant's own market research and Dr. Dennis' survey, the conjoint survey I conducted provides statistical evidence that consumers value the geographic origin of beer when making their purchasing decisions and assign a positive monetary value to Hawaii as a brewing location. The Boedeker Study gave the participants different choice menus with varying product attributes including brewing locations and prices for a variety of beers from which the participants could pick the one they preferred based on the attributes offered.

83. The respondents' choices among the product options in the different choice menus in the Boedeker Study were then utilized to construct demand curves. In the next step, demand curves for products with different attributes were compared to test if the change in attribute levels shifted the demand curves. If and when shifts in the demand curve were empirically identified, then the difference of the shift was quantified. In all cases, the demand curve shifted downward when the brewery location was Tennessee instead of Hawaii.

## 2.8 Dr. Lemon Incorrectly Argues that Individual Class Members' Facts and Circumstances Are Proof that Class-wide Damages Do Not Exist

84. Dr. Lemon incorrectly claims that "[t]he implication of Mr. Boedeker's conjoint analysis is that preferences over Kona's brewing location are not common across members of the proposed class"[39] because he utilizes individual part-worths estimates to calculate how many respondents prefer one brewing location over the other location without taking into consideration the estimated variances and covariances rather than considering the aggregated part-worths and the aggregate consumer demand.

85. The Boedeker Study proved that the aggregate demand shifts downward for the same Kona Beer when brewed in Tennessee rather than Hawaii. In other words, in order to sell the

---

[38] CBAKONA00001176-1223 - Super Brands presentation.
[39] Lemon Report, Paragraph 34.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

same volume of Kona Beer, the price for Kona Beer brewed in Tennessee would need to be substantially lower than for the Kona Beer brewed in Hawaii.

86. The downward shift in aggregate demand evidences the fact that Kona Beer brewed in Tennessee is viewed as less desirable by the market of all purchasers of Kona Beer than Kona Beer brewed in Hawaii. Thus, every purchaser of the beer suffered an economic loss because the demand for Kona Beer brewed in Tennessee would have been lower. That is what all members of the putative class have in common. Even the buyer of the beer who is indifferent about the brewing location or the buyer who would prefer the US brewing location overpaid by the price premium that the purported Hawaii-brewed Kona Beer yielded in the market. Again, Dr, Lemon's criticism is misguided by his failure to assess the impact of aggregate demand on the market price, which renders his opinion irrelevant and unreliable.

## 3   Summary and Conclusion

87.  In summary, the criticisms to the validity and reliability of the Boedeker Report presented by Dr. Lemon suffer from the following flaws:

   a.  Misrepresentations of the Boedeker Report.
   b.  Lack of knowledge of survey in general and conjoint surveys specifically, including the econometric and statistical methodology underlying CBC.
   c.  Citations out of context.
   d.  Failure to provide empirical evidence or statistical proof for his assertions.

88. The model presented in the Boedeker Report is based on a valid and reliable choice based conjoint study utilizing the scientific methodology of Mixed Logit modeling and Hierarchical Bayes estimation. In general, the results in the Boedeker Report can be relied upon to draw inferences about the value of a beer brewed in Hawaii to consumers. Because of the flaws and shortcomings in the Lemon Report, none of the opinions and conclusions offered therein have an impact on the reliability of my findings.

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**

89. The opinions set forth herein are based upon the information and data presently available to me. Additional, different, or updated data may be provided to me in the future, and I therefore reserve the right to amend or modify my opinions accordingly.

90. I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 28th day of May 2018, at Los Angeles, CA.

_____
Stefan Boedeker

**REBUTTAL DECLARATION OF STEFAN BOEDEKER**