# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

THEODORE BROOMFIELD, ET AL.,

Plaintiffs,

v.

CRAFT BREW ALLIANCE, INC.,

Defendants.

Case No.  17-cv-01027-BLF

**ORDER GRANTING MOTION TO CERTIFY CLASS**

[Re: ECF 83]

Poi, spam musubi, pineapple.  These are just a few of the foods that make most people think of Hawaii.  But what about Kona beer?  That's one question Plaintiffs Simone Zimmer and Theodore Broomfield ("Plaintiffs") hope to answer here by means of this class action lawsuit. Specifically, Plaintiffs claim that the packaging of certain Kona beer six- and twelve-packs deceive consumers into believing that Kona beer is brewed in Hawaii.  Plaintiffs allege that based on that mistaken belief, they and the proposed class members paid more for the beer than they otherwise would have paid.  So Plaintiffs seek to hold Defendant Craft Brew Alliance—the producer, marketer, and seller of Kona beer—liable for these misrepresentations and the injuries Plaintiffs and the class suffered as a result.

Presently before the Court is Plaintiffs' Motion for Class Certification.  Mot., ECF 83. Plaintiffs seek to certify four California consumer classes (two defined classes, each of which Plaintiffs seek to certify under both Rule 23(b)(2) and 23(b)(3)).  For each class, Plaintiffs seek to bring the following seven claims: (1) violation of California's Consumer Legal Remedies Act ("CLRA"), Cal. Civil Code § 1750, *et seq.*; (2) violation of California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (3) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17200, *et seq.*; (4) common law fraud; (5) intentional

United States District Court
Northern District of California

misrepresentation; (6) negligent misrepresentation; and (7) quasi contract / unjust enrichment / restitution.  *See* Mot. at i, 15; *see generally* First Am. Consolid. Compl. ("FACC"), ECF 65. Plaintiffs also ask the Court to appoint Faruqi & Faruqi, LLP and the Wand Law Firm, P.C. as class counsel.  Mot. at i.

The Court held a hearing on this motion on September 6, 2018.  For the reasons stated below, the Court GRANTS Plaintiffs' motion for class certification.

## I.    BACKGROUND

### A.    Kona's Packaging and CBA's Branding Strategies

Defendant Craft Brew Alliance, Inc. ("CBA") is a publicly traded conglomerate that acquired Kona Brewing Company ("Kona") in 2010.  FACC ¶ 16.  Prior to its acquisition by CBA, Kona had been brewing its beer in Hawaii since the company started in 1994.  *Id.* ¶ 17.  The Kona brand includes a variety of beers that reference Kona's Hawaiian origins, including the eight products for which Plaintiffs seek certification (the "Kona Beers"):  Longboard Island Lager, Hanalei IPA, Castaway IPA, Big Wave Golden Ale, Lemongrass Luau, Wailua Wheat, Fire Rock Pale Ale, and Pipeline Porter.  *See* Mot. at 2; Heikali Decl. ISO Mot. to Certify ("Heikali Decl."), Ex. 1, ECF 83-2; *see also* FACC ¶ 22.  Between 2013 and 2016, CBA's total sales rose from ~$16 million to ~$20.5 million, and between 2013 and October 2017, CBA depleted 4,772,530 "case equivalents" of beer—with each case equivalent equaling twenty-four twelve-ounce beers. Heikali Decl., Ex. 3, ECF 83-4; *id.*, Ex. 4, ECF 83-5.

Although Kona has a Hawaiian brewery that makes and sells draft beer in Hawaii, all of its bottled and canned beer, as well as its draft beer sold outside of Hawaii, are brewed in the states of Oregon, Washington, New Hampshire, Tennessee, and Colorado.  *See* Webb. Decl. ISO Opp. to Mot. to Certify ("Webb Decl."), Ex. A ("Mallory Tr.") at 59:17–60:3.  The labels of each Kona Beer list the locations of Kona's breweries, as does Kona's website.  Wang Decl., Ex B. ("Wang Tr."), at 63:11–13, ECF 85-3.  But Plaintiffs allege that Kona Beer is packaged and marketed in a manner that is intended to mislead reasonable consumers seeking to purchase a Hawaiian-made beer.  *See, e.g.*, FACC ¶¶ 23–25 ("In essence, Defendant intentionally misleads consumers into believing that a small brewery in Hawaii – which it owns and operates – brews all of the Kona

Brewing Co. Beers that Defendant sells on the mainland.").

The packaging for each variety of beer is adorned with its own Hawaiian-related images, including orchid flowers, volcanoes, palm trees, surfers, canoes, waterfalls, and hula dancers to match the theme of whichever beer is being marketed and sold.  *See* FACC ¶¶ 28–73; Heikali Decl., Exs. 9–23, ECF 85-5.  Each type of beer has its own slogan printed on the handle of the six-pack, such as "Thirst's Up!" on the package for Longboard Island Lager and "Catch a Wave!" for Big Wave Golden Ale.  FACC ¶¶ 30, 35.  Each Kona Beer also includes its own Hawaiian imagery, referred to by CBA as its "scene," that "pay[s] homage to a place in Hawaii."  Mallory Tr. at 130:10–15; 132:8–10; *see* Heikali Decl, Exs. 7 & 8.  These scenes appear on the front, sides, and back of the packaging.  *See id.*, Exs. 9–23.  The blueprints of these packages (known as "mechanicals") demonstrate that the scenes appear on each Kona Beer package in a uniform fashion.  *See* Mallory Tr. at 129:20–23 ("There are graphic components that are . . . consistent elements.").  This packaging is also consistent on a state-by-state basis, including on the packages sold in California.  *See id.* at 154:20–23.

Moreover, on the top of the each twelve-pack of Kona Beer there is an image of a map of Hawaii that marks the location of the Kona Brewing Co. Brewery on the Big Island.  *See id.* at 86:20–87:18; FACC ¶¶ 26, 32; *e.g.*, Heikali Decl., Ex. 10.  CBA's Brand Specification Guidelines recognize that these maps are "key assets" to creating a "sense of place" for the brand.  Heikali, Ex. 24, ECF 83-5.  The packaging of the twelve-packs also includes the statement:  "We invite you to visit our brewery and pubs whenever you are in Hawaii."  FACC ¶¶ 26, 32; *see, e.g.*, Heikali Decl., Exs. 10, 14, 16.  Plaintiffs raise several additional representations that they claim lead consumers to believe wrongly that Kona Beers are brewed in Hawaii.  *See* Mot. at 2–4.  *See generally* FACC.

Plaintiffs also point to several pieces of evidence that they believe demonstrate that CBA understands (and intends) that this packaging leads consumers to believe the beer is brewed in Hawaii.  In a 2015 Public Relations brief, CBA stated that "our brand is looked at much like an import, and the reason people pick us up is as much for the taste as it is for the island lifestyle it represent."  Heikali Decl., Ex. 36, ECF 83-10.  And that same brief noted that Kona's target

United States District Court
Northern District of California

audience is import drinkers.  *Id.*; *see also id.*, Ex. 37, ECF 83-10 ("Kona has the ability to play a long way from home like an import.").  According to Plaintiffs, CBA intends that the packaging play a key role in making Kona Beers appear to be imports.  For example, CBA's representative stated that "[p]ackaging is a component of what consumers look at when they're ultimately making their beer-buying decisions . . . ."  Mallory Tr. 76:1–9.  And Plaintiffs claim CBA has targeted the import audience through its advertising and marketing campaigns, which heavily reference Hawaii.  For example, its "Dear Mainland" advertising campaign features two Hawaiian "locals in real local locations to bring to life a Hawaii rarely seen stateside and firmly establish Kona as the one true Hawaiian beer in the process."  Heikali Decl., Ex. 29, ECF 83-7.  CBA argues that these facts are taken out of context and specifically that it is clear from the evidence that the "Dear Mainland" campaign is designed only to communicate a Hawaiian "mindset" and "culture" of taking time to breathe, of "liquid aloha."  Mallory Tr. 168:13–169:8; *see* Webb. Decl., Ex. B ("Wang Tr.") at 113:23–24; 126:1–3, ECF 85-3.

### B.    The Two Named Plaintiffs and Their Purchases of Kona Beers

Plaintiff Theodore Broomfield purchased a twelve-pack of Kona's Longboard Island Lager from Walgreens in San Francisco in February 2017.  Heikali Decl., Ex. 32 ("Broomfield Tr.") at 10:18–19, ECF 83-8; *see* FACC ¶ 12.  Plaintiff Simone Zimmer regularly purchased packages of Kona beer, including the Island Hopper Variety twelve-pack, which includes a selection of Kona Beer.  Heikali Decl., Ex. 33 ("Zimmer Tr.") at 69:11–71:18, ECF 83-9; *see* FACC ¶ 14.  Both Plaintiffs state that they saw and relied on the representations on the packaging of Kona Beer, and that their belief that the beer was brewed in Hawaii was one reason they decided to purchase the beers.  *See* Broomfield Tr. at 125:18–22; Zimmer Tr. at 110:6–20.  They both have also stated that they would be willing to pay more for Kona Beer brewed in Hawaii.  Broomfield Decl. ISO Mot. to Certify ¶ 4, ECF 83-19; Zimmer Tr. at 135:5–7.

### C.    Proposed Class Definitions

Plaintiffs seek to certify four total classes: two defined classes (the "Six-Pack Class" and the "Twelve-Pack Class") under both 23(b)(2) and 23(b)(3).  The class definitions are as follows:

#### 1.    Six-Pack Class:

1
2

> All persons who purchased any six-pack bottles of the Kona Beers in California at any time beginning four (4) years prior to the filing of this action on February 28, 2017 until the present.

3

### 2. Twelve-Pack Class:

4
5

> All persons who purchased any twelve-pack bottles of the Kona Beers in California at any time beginning four (4) years prior to the filing of this action on February 28, 2017 until the present.

6

As discussed, the "Kona Beers" included in the class definitions are the following eight

7

products: Longboard Island Lager, Hanalei IPA, Castaway IPA, Big Wave Golden Ale,

8

Lemongrass Luau, Wailua Wheat, Fire Rock Pale Ale, and Pipeline Porter. Mot. at 2. The Class

9

Period is four years before February 28, 2017 until the present.

10

## II.   LEGAL STANDARD

11

Federal Rule of Civil Procedure 23 governs class actions. "Before certifying a class, the

12

trial court must conduct a rigorous analysis to determine whether the party seeking certification

13

has met the prerequisites of Rule 23." *Mazza v. Am. Honda Motor Co., Inc.*, 666 F.3d 581, 588

14

(9th Cir. 2012) (internal quotation marks omitted). The burden is on the party seeking

15

certification to show, by a preponderance of the evidence, that the prerequisites have been met.

16

*See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349–50 (2011).

17

Certification under Rule 23 is a two-step process. The party seeking certification must first

18

satisfy the four threshold requirements of Rule 23(a)—numerosity, commonality, typicality, and

19

adequacy. Specifically, Rule 23(a) requires a showing that

20
21

> (1) the class is so numerous that joinder of all members is impracticable;

22

> (2) there are questions of law or fact common to the class;

23

> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

24
25

> (4) the representative parties will fairly and adequately protect the interests of the class.

26

The party seeking certification must then establish that one of the three grounds for certification

27

applies under Rule 23(b). Plaintiffs invoke Rule 23(b)(3) and Rule 23(b)(2).

28

Rule 23(b)(3) provides that a class action may be maintained where

United States District Court
Northern District of California

> the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
>
> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> (D) the likely difficulties in managing a class action.

A (b)(3) class is appropriate "whenever the actual interests of the parties can be served best by settling their differences in a single action."  *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1022 (9th Cir. 1998) (internal quotation marks omitted).  "When common questions present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication, there is clear justification for handling the dispute on a representative rather than on an individual basis."  *Id.* (citation and internal quotation marks omitted); *accord Mazza*, 666 F.3d at 589.

A class action may proceed under Rule 23(b)(2) where "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."  "The key to the (b)(2) class is the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them."  *Dukes*, 564 U.S. at 350 (citation and internal quotation marks omitted).  Rule 23(b)(2) "does not authorize class certification when each individual class member would be entitled to a different injunction or declaratory judgment against the defendant."  *Id.* (emphasis omitted).  Nor "does [it] authorize class certification when each class member would be entitled to an individualized award of monetary damages."  *Id.*

In considering a motion for class certification, the substantive allegations of the complaint are accepted as true, but "the court need not accept conclusory or generic allegations regarding the suitability of the litigation for resolution through a class action."  *Hanni v. Am. Airlines, Inc.*, No. 08-cv-00732, 2010 WL 289297, at *8 (N.D. Cal. Jan. 15, 2010); *see also Jordan v. Paul Fin.,*

United States District Court
Northern District of California

*LLC*, 285 F.R.D. 435, 447 (N.D. Cal. 2012) ("[Courts] need not blindly rely on conclusory allegations which parrot Rule 23 requirements." (citation and internal quotation marks omitted)). Accordingly, "the court may consider supplemental evidentiary submissions of the parties." *Hanni*, 2010 WL 289297, at *8 (citations omitted); *see also Blackie v. Barrack*, 524 F.2d 891, 901 n.17 (9th Cir. 1975).

"A court's class-certification analysis . . . may entail some overlap with the merits of the plaintiff's underlying claim." *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 465–66 (2013) (citation and internal quotation marks omitted). However, "Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage." *Id.* at 466. "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.*

## III.    DISCUSSION

The parties have engaged in extensive discovery in this case and have submitted a great deal of evidence in support of their respective positions. The Court has reviewed all of this evidence in detail. For the reasons discussed below, the Court is persuaded that it is appropriate to certify the proposed classes under both Rules 23(b)(2) and 23(b)(3) for each of Plaintiffs' seven causes of action.

### A.    Plaintiffs Have Met the Rule 23(a) Requirements

A named plaintiff bears the burden of demonstrating that the class meets the following four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. *See Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir.), *amended by*, 273 F.3d 1266 (9th Cir. 2001) (citing *Doninger v. Pac. Nw. Bell, Inc.*, 564 F.2d 1304, 1309 (9th Cir. 1977)). CBA contends that Plaintiffs have not demonstrated commonality, typicality, or adequacy. The Court discusses each Rule 23(a) requirement in turn.

#### 1.    Numerosity

United States District Court
Northern District of California

United States District Court
Northern District of California

Rule 23(a)(1) requires that the size of the proposed class be "so numerous that joinder of all the class members is impracticable." Impracticability is not impossibility, and instead refers only to the "difficulty or inconvenience of joining all members of the class." *Harris v. Palm Springs Alpine Estates, Inc.*, 329 F.2d 909, 913–14 (9th Cir. 1964) (citation and internal quotation marks omitted). While there is no set number cut-off, the number of individuals who will satisfy the requirements for membership in the proposed classes in this case easily satisfies the numerosity requirement. *See Litty v. Merrill Lynch & Co.*, No. cv 14-0425 PA, 2015 WL 4698475, at *3 (C.D. Cal. Apr. 27, 2015) ("[N]umerosity is presumed where the plaintiff class contains forty or more members."); *Welling v. Alexy*, 155 F.R.D. 654, 656 (N.D. Cal. 1994) (noting that courts have certified classes as small as 14 and have often certified classes with 50 to 60 members). Plaintiffs allege that for each year of the Class Period, CBA's sales of beer in California totaled in the tens of millions of dollars, including 4,772,530 case equivalents between 2013 and October 30, 2017. Mot. at 2; *see* Heikali Decl., Exs. 3 & 4. These numbers represent the sale of thousands, if not millions, of six- and twelve-packs of beer, no doubt purchased by thousands of consumers. Joinder of each of these affected individuals would be impracticable. CBA does not dispute that this requirement is satisfied. The Court thus concludes there is sufficient numerosity.

### 2. Commonality

The commonality requirement of Rule 23(a)(2) is met where "the class members' claims 'depend upon a common contention' such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each [claim] with one stroke.'" *Mazza*, 666 F.3d at 588 (internal citation omitted) (quoting *Dukes*, 564 U.S. at 350). Thus, plaintiffs seeking to certify a class must "demonstrate 'the capacity of classwide proceedings to generate common answers' to common questions of law or fact that are 'apt to drive the resolution of the litigation.'" *Id.* (quoting *Dukes*, 564 U.S. at 350). "[C]ommonality only requires a single significant question of law or fact." *Id.* at 589 (citing *Dukes*, 564 U.S. at 358). "The commonality preconditions of Rule 23(a)(2) are less rigorous than the companion requirements of Rule 23(b)(3)." *Hanlon*, 150 F.3d at 1019. "The existence of shared legal issues with divergent factual predicates is sufficient, as is

a common core of salient facts coupled with disparate legal remedies within the class." *Id.*

The Court finds that Plaintiffs have satisfied the commonality requirement.  In particular, Plaintiffs allege that "CBA's marketing and packaging of the Kona Beer involves a common course of conduct"—namely, including misrepresentations on all Kona Beer packaging—"which deceives consumers into believing Kona Beers are brewed in Hawaii."  Mot. at 13, *see id.* at 2–4. They also provide evidence that each consumer (and thus each potential class member) was exposed to the packaging at the point of purchase, such that each consumer was exposed to the alleged misrepresentation.  *See id.* at 3–4 (describing the packaging and uniform features across the types of Kona Beers).  CBA does not articulate specific objections to commonality, instead couching any such arguments in its opposition to predominance.  The Court discusses these arguments in the predominance section below.

Numerous courts have recognized that a claim concerning alleged misrepresentations on packaging to which all consumers were exposed is sufficient to satisfy the commonality requirement because it raises the common question of whether the packaging would mislead a reasonable consumer.  *See In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1096–97 (C.D. Cal. 2015) ("There is no question that all class members were exposed to the product packaging; this suffices to show commonality."); *In re ConAgra Foods, Inc.*, 302 F.R.D. 537, 569 (C.D. Cal. 2014) ("Because all class members were exposed to the statement and purchased Wesson Oil products, there is a common core of salient facts.").  Like those courts, this Court finds that these claims satisfy the low threshold of Rule 23(a)(2).

### 3.  Typicality

Rule 23(a)(3) requires that "the [legal] claims or defenses of the representative parties [be] typical of the claims or defenses of the class."  Typicality is satisfied "when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendants' liability."  *Rodriguez v. Hayes*, 591 F.3d 1105, 1122 (9th Cir. 2010) (citations omitted).  "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct."  *Evon v. Law*

*Offices of Sidney Mickell*, 688 F.3d 1015, 1030 (9th Cir. 2012) (internal quotation marks and citation omitted).  "Under the rule's permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members."  *Hanlon*, 150 F.3d at 1020.  Class certification is inappropriate where a putative class representative is subject to unique defenses which threaten to become the focus of the litigation.  *See Hanon v. Dataprods. Corp.*, 976 F.2d 497, 509 (9th Cir. 1992).

In the instant case, Plaintiffs' claims and those of the proposed class members arise out of CBA's allegedly false representations on its packaging that Kona Beers are brewed in Hawaii.  Plaintiffs have demonstrated that their claims are representative of the claims of the class.  Plaintiffs allege that they purchased Kona Beers during the Class Period, believing based on the packaging that the beers were brewed in Hawaii.  *See* Broomfield Tr. 10:18–19, 125:18–22; Zimmer Tr. 77–79, 110:6–20.  They testified that this belief was one reason they purchased the beer and that they were willing to pay more for the beer based on this belief, causing them injury.  *See* Broomfield. Decl. ¶ 4; Zimmer Tr. 135:5–7.  These allegations as to deception, materiality, and harm are all typical of the class as a whole.  Other courts have held class representatives bringing similar claims sufficiently typical.  *See, e.g.*, *Hadley v. Kellogg Sales Co.*, No. 16-cv-049550-LHK, 2018 WL 3954587, at *23–*25 (N.D. Cal. Aug. 17, 2018).

CBA challenges the typicality of Plaintiffs not based on the claims themselves, but rather because it believes those claims are "subject to unique defenses."  Opp. at 7, ECF 85.  Specifically, CBA argues that plaintiffs cannot demonstrate that they actually relied on the allegedly misleading packaging.  *See id.* (citing *Withers v. eHarmony, Inc.*, No. cv 09-2266-GHK, 2010 WL 11520198, at *2 (C.D. Cal. June 2, 2010)).  According to CBA, Plaintiffs admitted in their depositions and in the original complaint in this action that they saw not only the packaging, but also the *labels* of the beers and that those labels include the locations of the breweries.  *Id.*  CBA thus intends to argue that Plaintiffs could not have actually relied on the packaging because the labels would have informed them of the truth about the locations of the breweries.  This defense, CBA claims, is not typical of the class, many of whom may not have viewed the labels.

*Id.* at 7–8.[1]

The Court disagrees.  As class representatives, Plaintiffs are the only class members that must prove actual reliance, so by its very nature this defense is targeted solely at them.  *See Withers*, 2010 WL 11520198, at *2 (citing *In re Tobacco II Cases*, 46 Cal. 4th 298, 320–21 (2009)).  Were this defense alone enough to warrant denial of class certification, consumer claims such as the ones at issue here would never be certified.  As such, if Plaintiffs have put forth proof of their own actual reliance, that is sufficient to demonstrate typicality.

As an initial matter, the operative complaint in this action is Plaintiffs' first amended consolidated class action complaint, which makes no mention of any plaintiff viewing the labels with the alleged disclaimer as to mainland brewing locations.  Allegations in previous iterations of the complaint not included in the operative complaint are no longer allegations in the case.  For the same reason, named plaintiffs' refusals to answer questions regarding the removal of those allegations from the complaint are inapposite to the typicality inquiry (though they are discussed below as to adequacy).  *Cf.* Opp. at 8 (arguing Plaintiffs' refusal to answer questions about complaint amendment is relevant to typicality inquiry).

As to Plaintiffs' testimony, the Court agrees with Plaintiffs (Reply at 1) that they have never indicated that they saw the disclaimer about the brewery locations on the labels, such that they could not have actually relied on the packaging.  *See* Zimmer Tr. at 110:1–3 ("Q: When is the first time you saw the locations? A: Earlier this year [2016].")*; id.* 110:17 (testifying that she had no reason to look at the label or question the brewing location); *id.* 112:11–12 (noting original complaint does not say she read label in its entirety); Broomfield Tr. at 150:9–14 ("Q: And when did you first see the label for Longboard Lager?  A: Well, I must have seen it after I purchased and opened the 12-pack that I purchased at Walgreens."); *id.* at 157: 4–5 ("I was unable to see the label on each individual bottle until after I had made a purchase."); *cf. id.* at 129:1–19 (testifying he saw the label (after purchase) but making no mention of seeing the disclaimer).  Indeed, their

[1]  CBA also argues that Plaintiffs are not typical of class members who either may not have understood where Kona beer was brewed or did not purchase the beer based on the packaging's representations.  *See* Opp. at 8–9.  These are predominance arguments repackaged as typicality arguments.  The Court discusses these arguments under the predominance inquiry.

testimony is consistent with what this Court and others have recognized as reasonable consumer behavior:  Reasonable consumers are not expected to remove outer packaging to see labels obscured by that packaging.  *See* Motion to Dismiss Order at 12–14, ECF 44 (citing cases).  The Court thus holds that Plaintiffs have sufficiently proved typicality.

### 4.  Adequacy

Rule 23(a)(4) requires that the class representatives "fairly and adequately protect the interests of the class."  "Determining whether the representative parties adequately represent a class involves two inquiries: (1) whether the named plaintiff and his or her counsel have any conflicts of interest with other class members and (2) whether the named plaintiff and his or her counsel will act vigorously on behalf of the class."  *Calvert v. Red Robin Int'l, Inc.*, No. C 11–03026, 2012 WL 1668980, at *2 (N.D. Cal. May 11, 2012) (citing *Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir. 1978)).  These inquiries are guided by the principle that "a class representative sues, not for himself alone, but as representative of a class comprising all who are similarly situated.  The interests of all in the redress of the wrongs are taken into his hands, dependent upon his diligence, wisdom and integrity."  *Id.* (quoting *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 549 (1949)).

Plaintiffs contend that the interests of the proposed classes and of the proposed class representatives are the same, and that their individual claims and class claims arise from the same course of allegedly deceptive conduct for which they seek remedies applicable to and beneficial to the class.  Mot. 23.  They also contend that the named plaintiffs have played an active role in the litigation and are prepared to continue to do so vigorously after certification.  *See id.* at 23–24.  And they understand their duty to fairly and adequately represent that class.  *See id.* at 24.  Finally, Plaintiffs argue that they have retained highly capable counsel who have successfully prosecuted complex class actions in the past.  *Id.*; *see also* Heikali Decl. ¶¶ 5–8, Ex. 43, 83-11; Wand Decl. ¶¶ 3–7, ECF 83-13.  Defendant's sole objection to the adequacy of the named plaintiffs is based on their alleged "inconsistent allegations on reliance" (*i.e.*, that they changed their allegations regarding viewing the labels).  Opp. at 8 n.4.  The Court has already held it does not find the Plaintiffs' testimony or allegations inconsistent.  Accordingly, the Court finds the adequacy

United States District Court
Northern District of California

12

1 requirement satisfied.

2     **B.**    **Plaintiffs Have Met the Rule 23(b)(2) Requirements**

3         Rule 23(b)(2) states that class certification may be maintained where "the party opposing

4 the class has acted or refused to act on grounds that apply generally to the class, so that final

5 injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

6 Under this rule, class certification is appropriate "'only where the primary relief sought is

7 declaratory or injunctive.'" *Friend v. Hertz Corp.*, No. C–07–5222, 2011 WL 750741, at *4 (N.D.

8 Cal. Feb. 24, 2011), *aff'd*, 564 Fed. Appx. 309 (9th Cir. 2014) (quoting *Zinser*, 253 F.3d at 1195).

9 On the other hand, a class that seeks both monetary and injunctive relief "may be certified

10 pursuant to Rule 23(b)(2) where [the monetary] relief is 'merely incidental to [the] primary claim

11 for injunctive relief.'" *Zinser*, 253 F.3d at 1195 (quoting *Probe v. State Teachers' Ret. Sys.*, 780

12 F.2d 776, 780 (9th Cir. 1986)).

13         "Where a plaintiff seeks to certify a class under Rule 23(b)(2), such plaintiff must have

14 standing to seek the declaratory and/or injunctive relief sought on behalf of the class." *Friend*,

15 2011 WL 750741, at *4 (citing *Bates v. United Parcel Serv.*, 511 F.3d 974, 983–85 (9th Cir. 2007)

16 ("In a class action, standing is satisfied if at least one named plaintiff meets the [standing]

17 requirements.")). The Ninth Circuit has held that "a previously deceived consumer may have

18 standing to seek an injunction against false advertising or labeling, even though the consumer now

19 knows or suspects that the advertising was false at the time of the original purchase." *Davidson v.*

20 *Kimberly-Clark Corp.*, 889 F.3d 956, 969 (9th Cir. 2018).

21         CBA argues that the Court should not certify the classes under Rule 23(b)(2) for several

22 reasons. First, it claims that the class seeks primarily monetary relief that is not incidental to the

23 requested injunctive relief. *See* Opp. at 25. Next, it argues that the injunctive relief Plaintiffs seek

24 is unclear because they seem to be seeking both to enjoin CBA from making the representations at

25 issue and to force CBA to brew its Kona Beers in Hawaii. *See id.* Finally, it argues that Plaintiffs

26 lack standing because Plaintiffs have supposedly testified that they would only buy Kona Beers if

27 they were brewed in Hawaii. *See id.* (citing Plaintiffs' depositions).

28         The Court finds the Rule 23(b)(2) classes appropriate here. The Ninth Circuit has held that

United States District Court
Northern District of California

13

1    an injunctive class is appropriate where "class members complain of a pattern or practice that is

2    generally applicable to the class as a whole." *Walters v. Reno*, 145 F.3d 1032, 1047 (9th Cir.

3    1998). Plaintiffs claim that CBA has a uniform policy and practice of misrepresenting on its

4    packaging the brewing location of the Kona Beers. Enjoining those alleged misrepresentations

5    would provide relief to the class as a whole. Contrary to CBA's arguments, injunctive relief is the

6    "primary form of relief" available under the consumer protection laws. *In re Tobacco II Cases*, 46

7    Cal. 4th at 319; *see McGill v. Citibank, N.A.*, 2 Cal. 5th 945, 955–56 (2017). And in any event,

8    "whether the damages claims are incidental to the injunctive relief the plaintiffs seek is irrelevant,

9    because the plaintiffs are not seeking to recover damages for the proposed Rule 23(b)(2) class."

10   *Stathakos v. Columbia Sportswear Co.*, No. 15-cv-04543-YGR, 2017 WL 1957063, at *16 (N.D.

11   Cal. May 11, 2017) (alterations and citation omitted).

12         And Plaintiffs have sufficiently demonstrated that they have standing to bring these claims.

13   The Ninth Circuit's opinion in *Kimberly-Clark* is instructive. In that case, the plaintiff alleged that

14   the representation "flushable" on defendant's sanitary wipes was false and that she had relied on

15   that misrepresentation in buying the product. 889 F.3d at 969–71. The Ninth Circuit held the

16   plaintiff had plausibly alleged standing to seek an injunction because she still "desire[d] to

17   purchase wipes that [were flushable]," "would purchase truly flushable wipes manufactured by

18   [the defendant] if it were possible," and regularly saw the packaging but had "no way of

19   determining whether the representation 'flushable' was true." *Id.* at 970–71 (internal quotation

20   marks omitted). This was enough to allege that she faced "an imminent or actual threat of future

21   harm"—namely, "her inability to rely on the validity of the information advertised on [the

22   defendant's] wipes despite her desire to purchase truly flushable wipes." *Id.* at 971.

23         Plaintiffs make the same claims here. They have stated that they would purchase Kona

24   Beers made by CBA if they were actually brewed in Hawaii. *See* Zimmer Tr. at 133:23–134:17;

25   Broomfield Tr. at 159:4–15. They have also stated that they cannot buy Kona Beers with

26   confidence that the beers are actually brewed in Hawaii while CBA continues to use the current

27   alleged misrepresentations. *See* Zimmer Decl. ISO Mot. to Certify ¶ 3, ECF 83-18; Broomfield

28   Decl. ¶ 3; FACC ¶¶ 12–15. Thus, just like the plaintiff in *Kimberly-Clark*, Plaintiffs have alleged

United States District Court
Northern District of California

14

1   harm based on their "inability to rely on the validity of the information advertised . . . in deciding

2   whether or not [they] should purchase the product in the future."  889 F.3d at 971.  To remedy this

3   harm, they seek to enjoin CBA from making these false representations, not to force CBA to brew

4   its beer in Hawaii.  *See, e.g.*, FACC ¶ 95 ("This uncertainty, coupled with their desire to purchase

5   the Kona Brewing Co. Beers, is an ongoing injury that can and would be rectified by an injunction

6   enjoining Defendant from making the false and/or misleading representations alleged herein.").

7       Accordingly, Plaintiffs have met the requirements to proceed as a class under Rule

8   23(b)(2).

9       **C.   Plaintiffs Have Met the Rule 23(b)(3) Requirements**

10      "[T]he presence of commonality alone [under 23(a)(2)] is not sufficient to fulfill Rule

11  23(b)(3)."  *Hanlon,* 150 F.3d at 1022.  Rather, "[t]o qualify for certification under [Rule 23(b)(3)],

12  a class must satisfy two conditions in addition to the Rule 23(a) prerequisites: common questions

13  must 'predominate over any questions affecting only individual members,' and class resolution

14  must be 'superior to other available methods for the fair and efficient adjudication of the

15  controversy.'"  *Id.* (quoting Fed. R. Civ. P. 23(b)(3)).  In the instant case, Plaintiffs seek to certify

16  two Rule 23(b)(3) classes for seven different causes of action.

17          **1.   Predominance**

18      "'The Rule 23(b)(3) predominance inquiry' is meant to 'tes[t] whether proposed classes are

19  sufficiently cohesive to warrant adjudication by representation.'"  *Dukes*, 564 U.S. at 376

20  (alteration in original) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)).  The

21  predominance test of Rule 23(b)(3) is "far more demanding" than the commonality test under Rule

22  23(a)(2).  *Amchem*, 521 U.S. at 624.  Though common issues need not be "dispositive of the

23  litigation," *In re Lorazepam & Clorazepate Antitrust Litig.*, 202 F.R.D. 12, 29 (D.D.C. 2001), they

24  must "present a significant aspect of the case [that] can be resolved for all members of the class in

25  a single adjudication" so as to justify "handling the dispute on a representative rather than an

26  individual basis."  *Hanlon*, 150 F.3d at 1022.  Courts must thus separate the issues subject to

27  "generalized proof" from those subject to "individualized proof" to determine whether plaintiffs

28  have satisfied the predominance requirement.  *See In re Dynamic Random Access Memory*

United States District Court
Northern District of California

15

*(DRAM) Antitrust Litig.*, No. M 02-1486, 2006 WL 1530166, at *6 (N.D. Cal. June 5, 2006) ("Predominance requires that the common issues be both numerically and qualitatively substantial in relation to the issues peculiar to individual class members." (internal quotation omitted)). Whether the predominance requirement is satisfied in a particular case "turns on close scrutiny of 'the relationship between the common and individual issues.'" *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 958 (9th Cir. 2009) (quoting *Hanlon*, 150 F.3d at 1022).

CBA claims that Plaintiffs fail to meet the predominance standard on two fronts. First, it argues that the claims' elements of reliance and materiality require individualized proof. And second, it argues that Plaintiffs' damages model is not consistent with their theory of liability in the case, such that they fail to satisfy the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). The Court discusses each ground in turn.

### a. The Elements of the Claims, Including Materiality and Reliance

To apply the predominance standard, the Court begins by describing the underlying merits inquiry of each claim before turning to the question of how best to conduct such an inquiry. *Cf. Amgen*, 568 U.S. at 460 ("[T]he office of a Rule 23(b)(3) certification ruling is not to adjudicate the case; rather, it is to select the method best suited to adjudication of the controversy fairly and efficiently." (alterations and internal quotations omitted)). Given the similarities between the Six-Pack and Twelve-Pack classes, the Court addresses them together, but will separately assess the predominance of common questions on a claim by claim basis. *Berger v. Home Depot USA, Inc.*, 741 F.3d 1061, 1068 (9th Cir. 2014), *abrogated on other grounds by Microsoft Corp. v. Baker*, 137 S. Ct. 1702 (2017) ("[W]e must analyze each of the plaintiff's claims separately . . . . Each potential class must be analyzed on its own merits, with consideration given to the elements of the claim at stake." (citation omitted)). That said, Plaintiffs' consumer law claims may appropriately be analyzed together, as may their common law claims, as described below.

### i. Consumer Law Claims: CLRA, UCL, FAL

For the purposes of class certification, Plaintiffs' CLRA, UCL, and FAL claims are "materially indistinguishable" and thus can be analyzed together. *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK, 2014 WL 1410264, at *9 (C.D. Cal. Apr. 9, 2014). Claims under the CLRA,

United States District Court
Northern District of California

1    UCL and FAL are governed by an objective, "reasonable consumer" test.  *See Williams v. Gerber*

2    *Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008); *Hadley*, 2018 WL 3954587, at *10.  "Each statute

3    allows Plaintiffs to establish the required elements of reliance, causation, and damages by proving

4    that Defendants made what a reasonable person would consider a material misrepresentation."

5    *Forcellati*, 2014 WL 1410264, at *9; *see Astiana v. Kashi Co.*, 291 F.R.D. 493, 504 (S.D. Cal.

6    2013).  But the existence of a material misrepresentation alone is not sufficient.  To establish

7    reliance, the plaintiff must prove that the "defendant engaged in uniform conduct likely to mislead

8    the entire class."  *Davis-Miller v. Automobile Club of Southern California*, 201 Cal. App. 4th 106,

9    125 (Ct. App. 2011).  In the case of allegedly misleading packaging, "an inference of reliance

10   arises as to the entire class" if each member of the class was exposed to the misleading packaging.

11   *Wiener v. Dannon Co.*, 255 F.R.D. 658, 669 (C.D. Cal. 2009); *accord also Zakaria v. Gerber*, No.

12   LA CV15-00200 JAK, 2016 WL 6662723, at *8 (N.D. Cal. Mar. 23, 2016).

13          Plaintiffs argue that common issues predominate as to their consumer law claims because

14   CBA's packaging was materially misleading and all consumers in the class were exposed to that

15   packaging (thus showing reliance).  *See* Mot. at 18–19.  As to materiality, Plaintiffs rely on the

16   expert declaration by Dr. J Michael Dennis, which details the results of a consumer survey he

17   conducted that Plaintiffs claim demonstrates that CBA's packaging is materially misleading.

18   Dennis's report indicates that "71% of California craft beers consumers 'understand the Kona

19   product packaging' to mean that Kona beers are brewed in Hawaii."  Mot. at 6 (quoting Dennis

20   Decl. ISO Mot. to Certify ¶¶ 21, 46, ECF 83-20).  Dennis's survey results further demonstrate that

21   77.2% of consumers prefer to purchase Kona Beer brewed in Hawaii as opposed to on the

22   mainland, which Plaintiffs claim proves that the location of the brewery is material.  *Id.* at 7 (citing

23   Dennis Decl. ¶¶ 21, 46).  They also claim that CBA's own statements demonstrate that CBA

24   understands that consumers' beliefs about the brewing location are material, and that it

25   understands that its packaging is the "key vehicle" for delivering this message."  *See id.* at 7–8

26   (citing CBA internal documents).  As to reliance, Plaintiffs provide ample evidence that every

27   purchaser of six-packs and twelve-packs of Kona Beers during the Class Period was exposed to

28   the packaging and the allegedly misleading representations.  *See* Mot. at 2–4 (describing the

1   packaging); Heikali Decl., Exs. 4–23; FAC ¶¶ 26–73.

2       CBA argues that individual issues of reliance and materiality predominate.  *See* Opp. 8–14.

3   As to materiality, CBA chiefly challenges Dennis's consumer survey, arguing that it "does not

4   measure what consumers find material when purchasing beer in the real world or whether

5   consumers were motivated to purchase Kona beer because of its packaging or alleged

6   representations."  *Id.* at 13 (citing *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010,

7   1045 (C.D. Cal. 2018)).  It also argues that Dennis's survey "fails to consider that purchasing beer

8   is a multifactorial process" by focusing on only one factor (brewery location) without asking about

9   other factors, such as taste, price, and budget.  *Id.* at 14.  And it challenges Dennis's survey on

10  several other fronts, mainly criticizing the absence of certain types of questions.  *See id.*

11      As to reliance, CBA first argues that reliance requires individualized proof because it

12  requires an understanding of "what information each purchaser had regarding the product and

13  what information she relied on in making the purchase."  *Id.* at 9.  First, CBA claims that Kona

14  Beer purchasers were exposed to differing information, such that reliance cannot be inferred.

15  According to CBA, the packaging of each of the eight types of Kona Beers differs in meaningful

16  ways, by emphasizing aspects of the beers' tastes and compositions.  *See id.* at 10 (describing

17  packaging differences).  Likewise, there are other sources of information besides the packaging

18  that could inform a consumer of where Kona beer is brewed, including the labels, Kona's website,

19  tour guides on its Hawaii brewery tour, direct communications between CBA and consumers, and

20  employees at bars and restaurants at which the consumer purchased the beer.  *Id.* at 11.  Second,

21  CBA appears to argue that the consumers' subjective states of mind is critical to the inquiry,

22  turning on questions of "why . . . [the consumer] purchase[d] the product" and what the

23  "consumer[s'] states of mind, perceptions, and beliefs" were.  *Id.* at 9, 11. Finally, it claims that

24  individualized proof is necessary to determine whether individual "class members would

25  understand Kona's packaging to mean that the beers were brewed exclusively in Hawaii"—that is,

26  whether the packaging is misleading.  *See id.* at 12.

27      This Court holds that the elements of reliance and materiality in this case do not require

28  individualized proof but rather create common questions of fact and law that predominate.

United States District Court
Northern District of California

United States District Court
Northern District of California

As to materiality, the Court holds that Plaintiffs have demonstrated that common issues of materiality predominate.  Though both Plaintiffs and Defendants spend most of their time disagreeing as to whether Dennis's declaration sufficiently proves materiality, the question at this stage is not whether Plaintiffs have successfully proven materiality, but rather whether the materiality inquiry is a common question susceptible to common proof that helps to establish predominance.  *See Hadley*, 2018 WL 3954587, at *21 ("[E]ven if Kellogg is correct in its assertion that Plaintiff has failed to provide sufficient evidence of deception and materiality, that failure has no bearing on whether common questions will predominate over individual questions in the instant case.); *see also Amgen*, 568 U.S. at 481 ("[J]ust as a plaintiff class's inability to prove materiality creates no risk that individual questions will predominate, so even a definitive rebuttal on the issue of materiality would not undermine the predominance of questions common to the class.").  Because materiality is an objective question based on the reasonable consumer, it is common to the class and "ideal for certification."  *Id.* (citation omitted).

Even if the materiality evidence provided by Dennis were relevant at this stage, the Court finds that Dennis's survey results, in combination with the statements by CBA and Plaintiffs' damages experts' (Stefan Boedeker) results, are sufficient to raise the common question of whether the misrepresentations were material.  *See Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, No. 17-CV-00564 NC, 2018 WL 3126385, at *16 (N.D. Cal. June 26, 2018) (relying on consumer survey by Dennis and defendant's internal documents in finding individual materiality questions did not predominate).  Dennis's survey does not suffer from the same flaw as the expert's survey in *Townsend*, as argued by CBA.  In *Townsend*, 303 F. Supp. 3d at 1044–45, the expert's survey was not intended to (and thus did not) connect consumers' beliefs about the alleged misrepresentations to their actual purchasing decisions, whereas Dennis's survey links the belief to consumers' purchasing decisions, *see* Dennis Decl. ¶ 15 (describing survey as measuring "the extent to which (if any) Kona product packaging is material to the *purchasing decisions* of craft beer consumers by communicating the brewing location as the state of Hawaii." (emphasis added)); *id.* ¶ 46 (describing that key survey question instructed respondents to "select the beer you would *purchase*" (emphasis added)).  Moreover, Plaintiffs need not prove that the alleged

1   misrepresentation is the *only* material factor to their purchasing decisions to prove materiality, so

2   CBA's objection to Dennis's survey for not testing other factors motivating beer consumers is

3   irrelevant.  *See Hadley*, 2018 WL 3954587, at *22 ("[U]nder California law, Plaintiff is not

4   required to prove that the challenged health statements were 'the sole or even the predominant or

5   decisive factor influencing' the class members' decisions to buy the challenged products."

6   (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 581).

7       As to reliance, CBA is simply incorrect when it argues that the class members' subjective

8   preferences or individual beliefs about the packaging will be at issue.  The consumer claims

9   require an *objective* test, asking what the reasonable consumer would believe or think upon

10  exposure to the misleading statement.  *See Williams*, 552 F.3d at 938; *Hadley*, 2018 WL 3954587,

11  at *10.  Individual preferences and beliefs are immaterial.

12      CBA also fails to overcome the inference of reliance created by uniform exposure to the

13  allegedly misleading statements.  *See Wiener*, 255 F.R.D. at 669; *accord Zakaria*, 2016 WL

14  6662723, at *8.  CBA does not challenge Plaintiffs' claim that all consumers are exposed to the

15  packaging.  Instead, it claims that the Kona Beers' packaging meaningfully differ between the

16  beers and that consumers may have gotten conflicting information as to the brewing location of

17  the beers from other sources besides the packaging.  The Court is not convinced that the

18  differences in the packaging across the Kona Beers is sufficient to create individualized questions.

19  Each package includes a Scene referencing Hawaii on the front, sides, and back of the packages.

20  *See* Heikali Decl., Exs. 7, 9–23.  Moreover, each twelve-pack includes a map of the Hawaii islands

21  with a diamond callout marker to Kona's brewery and pubs in Hawaii and a statement inviting

22  consumers to CBA's brewery in Hawaii.  *See, e.g.*, *id.*, Exs. 10, 14, 16.  The packaging as a whole

23  and the references to Hawaii made thereon are sufficiently comparable to create common

24  questions of fact about the nature of the alleged misrepresentation.  *See Johnson v. Gen. Mills,*

25  *Inc.*, 275 F.R.D. 282, 289 (C.D. Cal. 2011) (cataloguing cases in which commonality and

26  predominance were found where "persistent and material message" was the same despite

27  differences in packaging).

28      Likewise, CBA's argument regarding class members' potential exposure to other

United States District Court
Northern District of California

20

information about the brewing location is irrelevant, as the fundamental question that predominates is whether the packaging was materially misleading to a *reasonable* consumer. *See Williams*, 552. F.3d at 938 ("We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box . . . ."); *cf. Wiener*, 255 F.R.D. at 669 (finding misrepresentation on packaging sufficient to infer reliance, even if plaintiffs did not see other misleading advertising). Were the existence of corrective information sufficient to warrant denying class certification, any potential consumer-product defendant to defeat class certification could simply post corrective information obscurely on its website and claim that individual consumers may have seen it.

For the foregoing reasons, the Court concludes that Plaintiffs satisfy the predominance requirement as to the elements of their claims under the CLRA, UCL, and FAL.

### ii. *Common Law Fraud, Fraudulent Misrepresentation, Negligent Misrepresentation*

Under California law, to state a claim for common law fraud and fraudulent misrepresentation a party must plead facts alleging five elements: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) the speaker's knowledge of falsity (scienter); (3) the intent to defraud or to induce reliance; (4) justifiable reliance; and (5) resulting damage. *Lazar v. Superior Court*, 12 Cal. 4th 631, 638 (1996) (fraud); *see* Judicial Council of California, Civil Jury Instructions ("Jury Inst.") § 1900 (intentional misrepresentation). Fraud requires both actual and reasonable reliance. *See Hoffman v. 162 North Wolfe LLC*, 228 Cal. App. 4th 1178, 1193–94 (Ct. App. 2014). A showing of reasonable reliance requires, in part, a showing of materiality. *Id.* Moreover, "a presumption, or at least an inference, of [actual] reliance arises wherever there is a showing that a misrepresentation was material." *Engalla v. Permanente Med. Grp., Inc.*, 15 Cal. 4th 951, 977 (1997).

The elements of negligent misrepresentation are "(1) a misrepresentation of a past or existing material fact, (2) made without reasonable ground for believing it to be true, (3) made with the intent to induce another's reliance on the fact misrepresented, (4) justifiable reliance on the misrepresentation, and (5) resulting damage." *Ragland v. U.S. Bank Nat'l Assn.*, 209 Cal.

United States District Court
Northern District of California

21

1    App. 4th 182, 196 (Ct. App. 2012).  These elements are the same as those for a claim of fraud,

2    "with the exception that there is no requirement of intent to induce reliance."  *Tenet Healthsys.*

3    *Desert, Inc. v. Blue Cross of Cal.*, 245 Cal. App. 4th 821, 845 (Ct. App. 2016)

4            Each of these claims thus requires a showing of a misrepresentation that was material, as

5    well as reasonable reliance on that misrepresentation.  As with Plaintiffs' consumer law claims,

6    resolution of each of these elements is common to the class.  *See In re First All. Mortg. Co.*, 471

7    F.3d 977, 991 (9th Cir. 2006) (affirming certification of fraud claim where defendant engaged in

8    uniform conduct toward whole class); *Brickman v. Fitbit, Inc.*, No. 3:15-CV-02077-JD, 2017 WL

9    5569827, at *6–*7 (N.D. Cal. Nov. 20, 2017) (holding that materiality and reliance standards

10   applied equally to consumer law, common law fraud, and negligent representation claims).  And

11   as to these claims' scienter element, the question of CBA's state of mind is also common to the

12   class.  *See Brickman*, 2017 WL 5569827, at *6 ("The California common law claims are also good

13   candidates for class treatment in that they focus in significant part on the falsity of the defendant's

14   statements, and the defendant's knowledge of falsity or assertion of a falsehood without

15   reasonable grounds."); *Brazil v. Dell Inc.*, No. C-07-01700 RMW, 2010 WL 5387831, at *5 (N.D.

16   Cal. Dec. 21, 2010) ("Whether these representations were false is susceptible to common proof in

17   the form of Dell's pricing histories, as well as through testimony from Dell's employees about the

18   pricing policies.").  Though proof of actual reliance is required as to each class member, the issue

19   of materiality will have a direct impact on that analysis, and thus the Court finds that this issue

20   alone is not enough to defeat predominance.

21          Thus, the Court holds that issues common to the classes predominate as to the elements of

22   the common law fraud, intentional misrepresentation, and negligent misrepresentation claims.

23                      *iii.  Quasi Contract/Unjust Enrichment/Restitution*

24          Finally, Plaintiffs seek "restitution, disgorgement, and/or imposition of a constructive trust

25   upon all profits, benefits, and other compensation obtained by Defendant from its deceptive,

26   misleading, and unlawful conduct."  FACC ¶ 170.  They base this cause of action on the same

27   allegations underpinning their common law and consumer law causes of action.  Thus, for the

28   same reasons that those causes of action meet the predominance standard, so too does this cause of

United States District Court
Northern District of California

22

1    action.  *See Brickman*, 2017 WL 5569827, at *7 (certifying unjust enrichment claim because the

2    defendant's "conduct [was] the same as to all members of the putative class" (internal quotation

3    marks and citation omitted)).

### b. Plaintiffs' Damages Model and Liability Theory

5        CBA next argues that Plaintiffs' damages model is not sufficiently tied to their theory of

6    liability, as required under *Comcast Corp. v. Behrand*, 569 U.S. 27, 35 (2013).  In *Comcast*, the

7    Supreme Court held that, in order to meet the predominance prong for class certification, the

8    plaintiff must provide a damages model showing that "damages are susceptible of measurement

9    across the entire class for purposes of Rule 23(b)(3)."  Moreover, the model "must measure only

10   those damages attributable to" the plaintiff's theory of liability.  *Id.*  That said, any calculations put

11   forth in the model "need not be exact" at the certification stage, *id.*; the goal is merely to put forth

12   a model that can "show that [the plaintiffs'] damages stemmed from the defendant's actions that

13   created the legal liability," *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013); *see*

14   *Just Film, Inc. v. Buono*, 847 F.3d 1108, 1121 (9th Cir. 2017) ("At this stage, Plaintiffs need only

15   show that such damages can be determined without excessive difficulty and attributed to their

16   theory of liability, and have proposed as much here.").  Since *Comcast*, the Ninth Circuit has

17   reaffirmed that the ultimate need for individualized findings as to the amount of damages does not

18   defeat class certification.  *Leyva*, 716 F.3d at 513–14.

19       According to Plaintiffs, "Plaintiffs' theory of liability and damages is that consumers paid

20   excess money, *i.e.*, a price premium, for Kona Beers under the mistaken belief that the beers were

21   brewed in Hawaii."[2]  Mot. at 19.  Their model to test this theory involves a two-pronged approach.

22

23   _____

24   [2]  Plaintiffs seek actual damages, not restitution, on their fraud, intentional misrepresentation, and negligent misrepresentation claims.  FACC ¶¶ 147, 155, 163.  Though they do not put forth a damages model to calculate those losses, it is clear they seek primarily "the amounts paid for the Kona Brewing Co. Beers, and any interest that would have accrued on those monies."  *Id.*

25   Although these calculations would be individualized as to each class member, the means of calculating this number (*i.e.*, the model for calculating it) is simple—the consumer simply proves

26   what they paid for the product.  Thus, the "model" is directly tied to those theories of liability.

27   Because the Ninth Circuit has repeatedly held that the damages calculations are individualized does not defeat predominance, the request for actual damages for those claims does not defeat predominance.  *See Vaquero v. Ashley Furniture Indus., Inc.*, 824 F.3d 1150, 1154–55 (9th Cir.

28   2016).

United States District Court
Northern District of California

First, Dennis's consumer survey tests whether Kona Beer's packaging leads consumers to believe the beers are brewed in Hawaii, and then tests whether that belief is material to those consumers' purchasing decisions. *See* Mot. at 20. These measures are proxies for reliance and materiality. *See* Dennis Report ¶ 15. Second, Plaintiffs' damages expert Stefan Boedeker's model uses Choice-Based Conjoint Analysis ("CBC") to test whether consumers' belief that Kona Beer is brewed in Hawaii allows CBA to charge a price premium for the beers—that is, whether CBA can (and does) charge more for Kona Beer because consumers believe the beers are brewed in Hawaii. *Id.* Boedeker's CBC model, described in more detail below, does not test any claim relating to CBA's packaging. The price-premium results of this analysis can then be used to determine the amount of restitution owed to each class member, based on the number of units of six- or twelve-packs they purchased. With Dennis's and Boedeker's analyses combined, Plaintiffs claim they can demonstrate reliance, materiality, and damages resulting from CBA's alleged misrepresentations, thus constituting a valid damages model tied to their theory of liability.

CBA challenges this damages model on multiple fronts. As discussed above with respect to materiality, it challenges Dennis's survey on multiple fronts. The Court has addressed and disposed of those argument. Defendant also challenges Boedeker's model on four grounds: (1) Boedeker's supplemental declaration should be stricken, and because that declaration contains the only California-based (as opposed to nationwide) damages results, his model fails; (2) the model fails to calculate the price premium received by CBA, only calculating the price premium paid by Plaintiffs; (3) the model is untethered from Plaintiffs' theory of harm for various reasons; and (4) the model reflects only consumer demand, while ignoring supply, such that it cannot be used to calculate the price premium. *See* Opp. at 16. The Court discusses each objection in turn.

### i. Boedeker's Supplemental Declaration

During discovery, Plaintiffs served Boedeker's Declaration on CBA. That Declaration applies Boedeker's model to calculate the price premium for a nationwide class, but not for a California class. *See generally* Boedeker Decl. ISO Mot. to Certify, ECF 84-14. After discovery ended, Plaintiffs served Boedeker's Supplemental Declaration, seeking to supplement his original Declaration with results demonstrating the price premium for a California class. *See* Boedeker

1    Suppl. Decl. ISO Mot. to Certify ¶¶ 1–4, ECF 79-16.  Boedeker used the same model and a subset

2    of the same data used in his original Declaration to find these results.  *See id.* ¶ 4.

3           CBA argues that this Supplemental Declaration should be stricken because of its

4    untimeliness.  It argues that such supplemental reports are only allowed for correcting inaccuracies

5    or adding information unavailable to the expert at the time of the original report.  Opp. at 16

6    (citing Fed. R. Civ. P. 26(e)).  Moreover, it argues that the report prejudiced it because it did not

7    have an opportunity to depose him about his allegedly new opinions or to have its own expert

8    review the new economic analysis for California.  *Id.*  Without the Supplemental Declaration,

9    CBA argues, Plaintiffs have no damages evidence as to California (the scope of the proposed

10   classes) and thus fail to prove predominance.

11          Plaintiffs argue that the supplemental declaration should not be stricken because

12   Boedeker's original Declaration was "incomplete," since it did not include a California-class

13   analysis.  Reply at 6.  Moreover, they argue that CBA was not prejudiced because the

14   Supplemental Declaration does not alter any of Boedeker's theories or opinions as it is based on

15   application of the same methodology to the same data from his original Declaration.  Reply at 6–7

16   (citing Boedeker Suppl. Decl. ¶¶ 1–4).  Finally, Plaintiffs assert that, in any event, whether the

17   Supplemental Declaration is permitted or not is irrelevant, as the original Declaration and the

18   model it proposes and tests on the nationwide class is sufficient to for class certification purposes.

19          The Court agrees with Plaintiffs' final argument—Boedker's original Declaration is

20   sufficient to support Plaintiffs' theory of liability, even as to California-based classes.  To test the

21   California class, Plaintiffs' expert can use the same model with the same (though a smaller subset

22   of) data.  The question at this stage of the litigation is not whether the model's results are accurate,

23   but rather whether the model is one that can be used to assess classwide damages as defined by

24   Plaintiffs' theory of liability.  *See Comcast*, 569 U.S. at 35.  Boedeker explicitly recognizes in his

25   original Declaration that his model "can be expanded in the merits phase of this case to

26   incorporate additional aspects if the Court deems necessary.  For example, economic loss

27   calculations can be performed on a class-wide basis but also across different geographies (e.g.,

28   specific states) . . . ."  Boedeker Supl. Decl. ¶ 150.  Because the model is the same when studying

25

nationwide and California-based classes, the model in the Declaration is sufficient for class certification purposes.

ii.   Failure to Account for the Price Premium Received by CBA

CBA next challenges Boedeker's model by claiming it calculates the potential restitution owed to the class improperly.  *See* Opp. at 17–18.  Boedeker's model is aimed at determining only "the difference between the price paid and the value received by customers who purchased Kona beers under the assumption that they were brewed in Hawaii when in fact they were not." Boedeker Decl. ¶ 148; *see* Mot. at 19.  This measurement is known as the price premium.  The price premium is the appropriate measure of restitution in consumer-fraud class actions.  *Brazil v. Dole Packaged Foods, LLC*, No. 12-CV-01831-LHK, 2014 WL 5794873, at *5 (N.D. Cal. Nov. 6, 2014) ("The proper measure of restitution in a mislabeling case is the amount necessary to compensate the purchaser for the difference between a product as labeled and the product as received."); *see Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654, 657 (9th Cir. 2017) (affirming district court certification of class in product labeling case where damages model calculated price premium).

CBA recognizes that the price premium is the appropriate measure for restitution, but argues that Plaintiffs' model fails to support their claims because it calculates only the price premium itself, without calculating the amount of the price premium *received by* CBA.  *See* Opp. at 18.  CBA argues that the California Supreme Court in *Kwikset v. Superior Courg*, 51 Cal. 4th 310, 336 (2011) held that restitution under the UCL must be measured in terms of the amount of money lost by the plaintiff and then acquired by the defendant.  To support its position, CBA argues that the district court in *Zakaria*, 2017 WL 9512587, at *21, applied *Kwikset*'s rule to UCL, FAL, and CLRA claims by granting a motion to decertify a class "because plaintiff's expert did not show what amount of the alleged price premium—if any—was received by the defendant."

Plaintiffs do not deny that Boedeker's model does not account for the price premium received by CBA, but they argue that the model need not account for that to appropriately calculate restitution.  Plaintiffs argue that *Zakaria* does not help CBA because *Zakaria* held only that where a damages model does not account for actual market prices, the plaintiff can, as an

1   alternative, calculate the amount paid by the consumer and received by the defendant.  *See* Reply

2   at 8.

3   The Court finds Plaintiffs' damages model is sufficient for calculating restitution damages

4   under the consumer-protection laws.  The Ninth Circuit in *Brazil v. Dole Packaged Foods, LLC*,

5   660 F. App'x 531, 535 (9th Cir. 2016), held that the amount the plaintiff could receive through a

6   disgorgement theory in his consumer-product case was "functionally the same" as the amount he

7   could receive through a restitution theory by calculating the price premium.  The Ninth Circuit

8   held that "[the defendant's] wrongfully obtained profits [were] equal to the victims' losses:  the

9   total price premium paid by all misled purchasers."  *Id.*  Thus, the Ninth Circuit has confirmed that

10  the price premium paid by the plaintiff is the correct measure of restitution because it is equivalent

11  to the amount received by the defendant.[3]  The decision in *Zakaria* is not contrary, as the damages

12  model there was "not sufficiently tethered to actual market conditions, including pricing and

13  premiums," *Zakaria*, 2017 WL 9512587, at *20, providing evidence only on the plaintiffs

14  "potential willingness to pay a premium," *id.* at *21.  This holding is perfectly consistent with the

15  numerous district court opinions certifying classes after *Kwikset* based on price premium damages

16  models that account for actual market conditions, as discussed in more detail below with respect to

17  whether Boedeker included supply-side factors in his damages model.  *See, e.g.*, *Hadley*, 2018 WL

18  3954587, *13; *Dr. Pepper*, 2018 WL 3126385, at *18.

### iii.  The Model's Connection to Plaintiffs' Theory of Harm

20  CBA also challenges Boedeker's model on several grounds related to Plaintiffs' theory of

21  liability.  *See* Opp. at 20.  Again, Plaintiffs state their theory of liability as follows:  "Plaintiffs'

22  theory of liability and damages is that consumers paid excess money, *i.e.*, a price premium, for

23  Kona Beers under the mistaken belief that the beers were brewed in Hawaii."  Mot. at 19.

24  First, CBA argues that Boedeker's model fails because he did not show survey respondents

25  images of the packaging; without having showed the packaging, CBA argues, Boedeker's model

---

[3]  Under this same rule, Plaintiffs' unjust enrichment claim may proceed.  Though they seek disgorgement of profits, FACC ¶ 170, the Ninth Circuit has held the amount sought via that remedy to be equivalent to the price premium sought via restitution.

United States District Court
Northern District of California

1    cannot possibly test the impact of that packaging on consumer purchasing decisions.  *See* Opp. at

2    19 (citing *Davidson v. Apple, Inc.*, 16-CV-4942-LHK, 2018 WL 2325426, at *23 (N.D. Cal. May

3    7, 2018).  Plaintiffs counter that their damages model is "two-pronged":  First, Dennis's survey

4    establishes that "based on the packaging, consumers believe the Kona beers are from Hawaii."

5    Reply at 9.  And second, Boedeker's model tests the impact of that belief, using "CBC, a well-

6    established scientific method for calculating a price premium attributable to a specific attribute"—

7    here the attribute of brewing location.  *Id.*  Thus, Boedeker's survey need not have asked about the

8    packaging because that it the function of Dennis's survey.

9          The Court agrees with Plaintiffs that Boedeker's model need not account for the impact of

10   the product packaging in order to be tied to Plaintiffs' theory of liability.  As discussed above,

11   Dennis's survey is aimed at answering the questions of whether Kona beers' packaging misleads

12   consumers into believing the beer is brewed in Hawaii and whether that belief is material to the

13   consumers' purchasing decisions.  *See generally* Dennis Decl.  If the answer to both of those

14   questions is yes, then the only question that remains is how purchases based on that belief have

15   injured consumers.  That is the question Boedeker's model seeks to answer.  Thanks to Dennis's

16   results, the packaging is irrelevant to this final question, and thus unnecessary to Boedeker's

17   model.  CBA's reliance on *Davidson* is misplaced.  In that case, the Court held the damages model

18   was not tied to the theory of liability in part because it asked only about a generic defect instead of

19   the defect at issue (*i.e.*, the attribute allegedly misrepresented).  *Davidson*, 2018 WL 2325426, at

20   *23.  Here, the attribute in question is the brewing location, not the packaging as CBA implies.

21   Because Boedeker tested that exact attribute, his model is appropriate.

22         CBA next argues that Boedeker's model incorrectly used Memphis, Tennessee as a proxy

23   for all mainland brewing locations as a means of comparing preferences for Hawaii and mainland

24   brewing locations.  It also argues that Boedeker's model fails because it only accounts for two

25   attributes (price and brewing location) while ignoring other attributes that impact consumer

26   preferences, such as type, style, and flavor of beer.  *See* Opp. at 19–20 (citing *In re 5-Hour Energy*

27   *Mktg. and Sales Practices Litig.*, 2017 WL 2559615, at *11 (C.D. Cal. June 7, 2017).  Plaintiffs

28   argue that Boedeker's decision to use Memphis was a reasonable judgment call, and that his use of

certain attributes over others is of no moment, because he included other important factors and CBC holds constant any factors not included in the survey.

The Court finds that these issues are not sufficient to disqualify Boedeker's model.  As an initial matter, they appear to be targeted at the efficacy of Boedeker's survey and the weight it should be given, as opposed to the model's ability to test Plaintiffs' theory of liability.  Such arguments are more appropriate at the merits stage of the litigation.  The question here is whether Boedeker's model *can* test Plaintiffs' theory, not whether it accurately does so at this stage.  To the extent it fails to include key attributes or account for differences in preference as to various mainland brewing locations, these issues do not speak to the efficacy of his model writ large for testing Plaintiffs' theory.  In any event, the Court is not convinced that the failure to include these attributes is a problem.  Boedeker's model did account for several key attributes and CBC accounts for attributes not expressly included in the survey.  *See* Boedeker Decl. ¶¶ 107, 112–15 (discussing attributes and reasons for selection); Boedeker Rebuttal Decl. ISO Mot. to Certify ¶¶ 58–61, ECF 83-15.  Clearly the model cannot account for *all* important attributes.  The decision in *In re 5-Hour Energy* is not contrary.  There, the Plaintiffs had failed entirely to account for "the value of the ingredients to the consumer," and thus could not adequately measure restitution.  *5-Hour*, 2017 WL 2559615, at *10–*11.  Here, Boedeker's model specifically aims to calculate the value of the brewing location to the consumer.  *See generally* Boedeker Decl.

Finally, CBA argues that Boedeker's model is flawed because it awards damages to all purchasers, even though Dennis's survey demonstrates that a large minority of consumers do not believe Kona Beers are brewed in Hawaii and thus were not injured.  *See* Opp. at 20.  Plaintiffs argue that CBA misapprehends Boedeker's damages model, which demonstrates that 100% of consumers who purchased the Kona Beers paid more because the Hawaii misrepresentations allow CBA to charge a higher price for the beers, whether or not the specific consumer actually believes the beer is brewed in Hawaii.  *See* Reply at 10.

The Court again agrees with Plaintiffs.  As set out above, the question of individual consumer preferences and beliefs is irrelevant to the questions of materiality and reliance under California consumer laws.  *See Williams*, 552 F.3d at 938.  Likewise, it is irrelevant to the

1   damages model here—the consumer need not have actually relied on the misrepresentation.

2   Instead, Boedeker's model tests the difference between the price paid for a Kona Beer believed to

3   be brewed in Hawaii and the value received given that the beer is actually brewed on the

4   mainland.  *See* Boedeker Decl. ¶ 148.  This allows Boedeker to test how much "the price for the

5   beer would have gone down if all consumers had known the beer is not brewed in Hawaii at the

6   time of purchase."  Boedeker Rebuttal Decl. ¶ 9.  "[I]f aggregate demand shifts downward, the

7   economic loss is the same for each buyer regardless of their individual preferences."  *Id.* ¶ 13.

8   That is, all individuals suffer economic loss (*i.e.*, pay more).  Boedeker's model thus can

9   demonstrate that each consumer, regardless of belief, paid more for Kona Beers given the

10  allegedly material misrepresentations.

11         None of CBA's arguments demonstrate that Plaintiffs' damages model is not tied to their

12  theory of liability or harm.

13                    iv.  Whether the Model Adequately Accounts for Supply-Side Factors

14         In its final and most substantial argument, CBA argues that Boedeker's CBC damages

15  model calculates only consumers' willingness to pay (*i.e.*, demand) and thus improperly ignores

16  consideration of supply-side factors.  *See* Opp. at 21.  "[I]n cases where price premia are the

17  relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure

18  demand-side willingness-to-pay."  *Hadley*, 2018 WL 3954587, at *13; *see, e.g.*, *NJOY*, 2016 WL

19  787415, at *7; *Saavedra v. Eli Lilly & Co.*, No. 2:12-CV-9366-SVW, 2014 WL 7338930, at *4–*5

20  (C.D. Cal. Dec. 18, 2014).  CBA claims that Boedeker's model does not account for the supply

21  side because Boedeker did not take into account real world pricing data and instead arbitrarily

22  assigned prices to the Kona Beers in his surveys by researching prices on the internet.  *See* Opp. at

23  21–22.  And CBA states that in his survey Boedeker improperly compared Kona Beers to

24  products that were not sold either in California or in twelve-packs.  *Id.* at 22.  Because his model is

25  based on "fictional prices [and] fictional products," CBA argues, it cannot survive under *Comcast*.

26  *Id.* at 23.  Moreover, CBA argues in passing that Boedeker's model fails because it does not

27  account for CBA's use of line-pricing, which CBA argues is compelling evidence of a lack of a

28  price premium.  *Id.* at 20.  Finally, CBA argues that a CBC model is inappropriate here because

30

United States District Court
Northern District of California

1    the marketplace for beer is dynamic.  *Id.* at 23–24.

2         Plaintiffs counter CBA's arguments by first arguing that Boedeker's model sufficiently

3    accounts for supply-side factors by using "the number of units sold and prices that were extant in

4    the market"—that is, "the supply is fixed" in Boedeker's model.  Reply at 11.  They also note that

5    at least three courts have held the a CBC-model proposed by Boedeker sufficiently accounted for

6    the supplyside.  *Id.* (citing *In re Dial Complete Mktg. and Sales Practice Litig.*, 320 F.R.D. 326,

7    334 (D.N.H. 2017); *In re MyFord Touch Consumer Litig.*, 291 F.Supp.3d 936, 970 (N.D. Cal.

8    2018); *Davidson*, 2018 WL 2325426, at *22).  They also argue that Boedeker used actual sales

9    data, setting a price range that need only encompass "the range of real-world prices."  *Id.* at 12.

10   And in any event, they argue, his model can easily be applied to real world sales data in the next

11   stage of litigation.  *Id.*

12        Plaintiffs also refute CBA's line pricing argument on several grounds.  First, they contend

13   that CBA does not line price in the traditional sense by similarly pricing one Kona Beer to another

14   Kona Beer.  They state that to the extent Kona "line prices," it is with the top-selling craft beers in

15   each California market and with import beers—products with many different attributes, such that

16   it makes line pricing irrelevant.  *Id.* (citing *In re POM*, 2014 WL 1225184, at *5).  They also

17   challenge CBA's reliance on *Wiener* because in that case the line pricing was between the

18   defendant's products that contained the misrepresentations and those that did not, whereas all

19   Kona Beers contain the alleged misrepresentations.  *Id.* at 13.  Finally, as to purported instability

20   of the market, Plaintiffs rebut this claim by stating that the beer market is stable and that any

21   purported discounts apply to *all* craft beer, such that it does not bear on the price premium specific

22   to Kona Beers, but rather reflects a competitive market ripe for CBC analysis.  *Id.* at 14.

23        The Court agrees with Plaintiffs (and the myriad courts to consider Boedeker's reports in

24   similar cases) that Boedeker's CBC model accounts for supply-side factors.  Judge Koh's decision

25   in *Hadley* is instructive.  Judge Koh first explained how CBC analysis works:  "Survey

26   respondents are . . . asked to choose between different sets of product attributes, the responses are

27   aggregated, and statistical methods are then used to determine the value (often termed

28   "partworth") that consumers attach to each specific attribute."  *Hadley*, 2018 WL 3954587, at *11;

United States District Court
Northern District of California

1   *see* Boedeker Decl. ¶¶ 69–74.  The expert there proposed to use a range of prices that mirrored

2   those actually observed in the market and was based on actual sales data, as well as quantity

3   figures reflecting actual products sold during the class period.  *Hadley*, 2018 WL 3954587, at *12.

4   This analysis, the expert stated, would yield estimates of the market price premia.  *Id.*  The

5   defendant challenged this method, arguing that it measured only consumers' subjective

6   willingness to pay and not critical supply-side factors.  *Id.*  Judge Koh disagreed, recognizing that

7   CBC can account for supply-side factors when "(1) the prices used in the surveys underlying the

8   analyses reflect the actual market prices that prevailed during the class period; and (2) the

9   quantities used (or assumed) in the statistical calculations reflect the actual quantities of products

10  sold during the class period."  *Id.* at *13 (citing cases).  Judge Koh then held that the expert's

11  model comported with these requirements because the prices used mirrored those observed in the

12  market and were based on actual sales data, and because the model held the quantity constant.

13      Similarly, in *Davidson*, Judge Koh rejected this same argument as to a report by Boedeker

14  because Boedeker's report "discusse[d] the role of supply in conjoint analysis at length" and held

15  the supply fixed.  *Davidson*, 2018 WL 2325426, at *22.  She also rejected the defendant's

16  argument that Boedeker's model "fail[ed] to incorporate the actual prices" of the product because

17  Boedeker "expressed economic loss as a percentage of [the product's] cost, and [the defendant

18  did] not explain why this could not easily be applied to the actual price a given consumer paid for

19  [the product]."  *Id.*

20      These same rationales apply to Boedeker's model here, in which he sufficiently accounts

21  for supply-side factors.  Indeed, in a section entitled "Consideration of the Supply Side in the

22  Economic Damages Model," Boedeker walks through exactly how his model accounts for supply:

23  He states that "[t]he supply curve in the damages model is identical" whether Kona did or did not

24  misrepresent its brewing location because disclosure "has no impact on the marginal costs of the

25  supplier and therefore the supply curve."  Boedeker Decl. ¶ 57; *see Davidson*, 2018 WL 2325426,

26  at *22 (relying on nearly identical language from Boedeker report).  In other words, the model

27  assumes that CBA would have wanted to sell the same number of beers with or without the

28  representatons—that is, supply is fixed.  As the Court in *Davidson* recognized, this distinguishes

the model from those used in *NJOY*, 2016 WL 787415 and *Saavedra*, 2014 WL 7338930, where "willingness to sell" was completely ignored.  2018 WL 2325426, at *22; *see also Hadley*, 2018 WL 3954587, at *12.

Moreover, the Court finds no issue with the prices Boedeker used in his survey.  In describing why he selected those prices, Boedeker explains that "the prices are not necessarily the exact prices charged for Kona beer in the market," but instead reflect a "realistic" price range for the product, which can and must include prices "higher or lower than the prices of currently offered products."  Boedeker Decl. ¶ 108.  Boedeker states that he determined the price range he used based on his "review of retail prices for various major retailers for the beers" used in the study, as determined from a review of prices online.  *Id.*  CBA does not argue that this range was inappropriate, and indeed its own expert's report demonstrates that Boedeker's range comports with real world pricing data.  *See* Webb Decl., Ex. C ("Lemon Decl.") ¶¶ 78–84, ECF 85-4.  The Court finds this sufficient to demonstrate Boedeker utilized real world prices to support his model.  And in any event, as in *Davidson*, any failure on this front could seemingly be cured by applying the percentage of economic loss found using Boedeker's model to the actual price each plaintiff paid.  *See Davidson*, 2018 WL 2325426, at *22; *cf.* Boedeker Decl. ¶ 148 (reporting price premium results as percentage).

The Court is likewise not convinced by CBA's arguments that its alleged line pricing and the "dynamic" nature of the beer market impact this analysis.  As to line pricing, CBA relies on *Weiner v. Snapple Beverage Corp.*, No. 07-CV-8742 DLC, 2010 WL 3119452, at *10 n.19 (S.D.N.Y. Aug. 5, 2010), for the proposition that "line pricing is compelling evidence of no price premium."  Opp. at 20.  It does not cite its own expert report for support.  But *Weiner* is no help to CBA because there the court noted implicitly (in dicta) that line pricing (*i.e.*, identical pricing) between the defendant's products with and without the misrepresentations indicated that the misrepresentation did not create a price premium.  By contrast, CBA's Kona Beer products all contain the misrepresentation, so whether or not it line prices those products with one another is not instructive.  Also, it is not clear from the evidence that CBA actually *does* line price its products with one another.  *See* Mallory Tr. 25:6–9, 28:22–23 (describing "line pricing" with

1    competitor beers); Lemon Decl. ¶ 74 (describing CBA's wholesale pricing strategy as aiming to

2    match other craft beer retail prices).

3           As to the supposed dynamism of the marketplace, this argument ultimately boils down to

4    an argument that "Boedeker's conjoint analysis [cannot] provide reliable results."  Opp. at 23

5    (citing Lemon Decl. ¶ 201; Webb. Decl., Ex. O ("Lemon Sur-Rebuttal Decl.") ¶ 60, ECF 85-16.

6    Even assuming the market is dynamic, neither of the cases CBA cites for the proposition that "the

7    conjoint methodology is *only* appropriate if the marketplace for the product is relatively stable"

8    actually stands for that proposition.  In *Saavedra*, the court held only that the price of a drug on the

9    prescription drug market—a highly inefficient, highly regulated market—was not a good proxy for

10   the *subjective* value of the product to the consumer (*i.e.*, the consumer's willingness to pay).

11   *Saavedra*, 2014 WL 7338930, at *5.  Here, as discussed, Boedeker models not *subjective*

12   valuation, but rather both supply and demand.  *Cf.* Lemon Sur-Rebuttal Decl. ¶ 60 (citing Lemon

13   Decl. ¶ 155) (arguing as basis for dynamic market argument that Boedeker's model ignores

14   retailers' actual pricing strategies).  And CBA does not argue that the beer market is as highly

15   regulated and inefficient as the prescription drug market.  Likewise, in *Dr. Pepper*, the court

16   analyzed under *Daubert* the expert report at issue by comparing it with the *Saavedra* report, noting

17   that the report at issue took into account the supply side of the market.  *Dr. Pepper*, 2018 WL

18   3126385, at *7.  It also noted that plaintiffs had claimed the market was long-established and

19   efficient, such that the retailers' pricing was responsive to market forces.  So too here.  Boedeker

20   notes that the differences in retail pricing in the craft beer market reflects that the market is

21   competitive and responds to consumer demand.  *See* Boedeker Rebuttal Decl. ¶¶ 63–64.  CBA has

22   not sufficiently rebutted this evidence.

23          Because none of CBA's arguments against Plaintiffs' damages model holds water, the

24   Court finds the damages model is sufficiently tied to Plaintiffs' theory of liability such that

25   predominance is not defeated.

26               **2.  Superiority**

27          To satisfy Rule 23(b)(3), Plaintiffs also must demonstrate that "a class action is superior to

28   other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P.

United States District Court
Northern District of California

34

23(b)(3).  Rule 23 lists the following factors that Courts should consider in making this

determination:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions;

> (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

> (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

> (D) the likely difficulties in managing a class action.

Plaintiffs argue that class litigation is the superior means of litigating the claims asserted

because all four factors favor certification.  Mot. at 21–22.  First, consumers would not be

incentivized to pursue an individual action because of the low price of Kona Beers.  Second, there

does not appear to be existing litigation concerning these claims.  Third, public policy favors class

actions to help ensure compliance with consumer-protection laws.  And fourth, the class action

would allow the class to adjudicate their claims efficiently.  CBA counters that this class action

would be too difficult to manage because of the practical difficulties of identifying class members.

*See* Opp. at 24.

The Court finds a class action here would be the superior method of adjudication.  The

alternative to class action would surely mean an abandonment of claims by most class members

since the amount of individual recovery is so small—just a few dollars per pack purchased.  *Cf.*

*Mazza*, 254 F.R.D. at 628 (finding superiority when damages were $4,000).  And there are no

specific management concerns raised by CBA other than ascertainability of the class members.

But there is no ascertainability issue here because the class definition is "sufficiently definite so

that it is administratively feasible to determine whether a particular person is a class member."

*Astiana v. Ben & Jerry's Homemade, Inc.*, No. C 10-4387 PJH, 2014 WL 60097, at *3 (N.D. Cal.

Jan. 7, 2014).  The class members are individuals who purchased a six- or twelve-pack of any of

the Kona Beers in California during the Class Period.  The means by which class members can

prove they purchased the beers is an issue prevalent in every single consumer-product class action

such that it alone cannot possibly bar certification on its own.  Even if there were such concerns,

the Court will not refuse to certify the class solely because of manageability concerns.  *See*

1   *Hadley*, 2018 WL 3954587, at *4.  As such, the Court finds the superiority requirement met.

2       **D.**    **Appointment of Lead Counsel**

3         Federal Rule of Civil Procedure 23(g)(2) states that: "When one applicant seeks

4   appointment as class counsel, the court may appoint that applicant only if the applicant is adequate

5   under Rule 23(g)(1) and (4).  Rule 23(g)(1) requires the court to consider:

6              (i) the work counsel has done in identifying or investigating potential
7              claims in the action;

           (ii) counsel's experience in handling class actions, other complex
8              litigation, and the types of claims asserted in the action;

9              (iii) counsel's knowledge of the applicable law; and

10             (iv) the resources that counsel will commit to representing the class.

11  In addition, the court "may consider any other matter pertinent to counsel's ability to fairly and

12  adequately represent the interests of the class."  Rule 23(g)(4) states that the duty of class counsel

13  is to fairly and adequately represent the interests of the class.

14        Plaintiffs have retained highly capable counsel with extensive experience in successfully

15  prosecuting consumer class actions.  *See* Heikali Decl. ¶¶ 5–8, Ex. 43; Wand Decl. ¶¶ 3–7.

16  Accordingly, and without any opposition, the Court finds that Faruqi & Faruqi, LLP and the Wand

17  Law Firm, P.C. are adequate under Rule 23(g)(1) and (4).

18  **IV.**    **ORDER**

19        For the foregoing reasons, IT IS HEREBY ORDERED that:

20        1.    Plaintiffs' Motion for Class Certification is GRANTED.  The action is certified for

21  the Rule 23(b)(2) and 23(b)(3) Six-Pack and Twelve-Pack Classes as to the claims under the UCL,

22  the FAL, and the CLRA and for common law fraud, fraudulent misrepresentation, negligent

23  misrepresentation, and quasi-contract/unjust enrichment.

24        2.    Pursuant to Rule 23(c)(1)(B),

25            a.  The Six-Pack class is defined as, "all persons who purchased any six-pack

26               bottles of the Kona Beers in California at any time beginning four (4) years

27               prior to the filing of this action on February 28, 2017 until the present."

28            b.  The Twelve-Pack class is defined as, "all persons who purchased any twelve-

*United States District Court*
*Northern District of California*

1                pack bottles of the Kona Beers in California at any time beginning four (4)

2                years prior to the filing of this action on February 28, 2017 until the present."

3       c.    The class issues are[4] (1) whether CBA materially misrepresented that its beers

4                were brewed in Hawaii, (2) whether members of the class reasonably relied on

5                those representations; (3) whether Kona Beers' packaging is likely to deceive a

6                reasonable consumer into believing the beers are brewed in Hawaii;(4) the

7                scienter with which CBA acted in making those representations; and (5) the

8                price premium paid, if any, by consumers based on their allegedly mistaken

9                belief that the Kona Beers were brewed in Hawaii.

10      3.      The Court appoints Theodore Broomfield and Simone Zimmer as the class

11 representatives.

12      4.      Pursuant to Rule 23(g), the Court appoints Faruqi & Faruqi, LLP and the Wand

13 Law Firm, P.C. as class counsel.

14      5.      The parties shall meet and confer no later than October 15, 2018, as to whether

15 notice should be given to the class pursuant to Rule 23(c)(2)(B).

16

17      **IT IS SO ORDERED.**

18

19 Dated: September 25, 2018

20

21                                    BETH LABSON FREEMAN
                                    United States District Judge

22

23

24

25

26

27

28

United States District Court
Northern District of California

---

[4] Plaintiffs failed to enumerate proposed class issues in their motion, but the Court has gleaned this list from the issues raised therein.  To the extent this list is under-inclusive or otherwise incorrect, the parties may so advise the Court through proper notice.